217 F.3d 1256 (9th Cir. 2000)
 In re: COMPTON IMPRESSIONS, LTD., a California limited partnership, Debtor.
COMPTON IMPRESSIONS, LTD., a California limited partnership, Appellant,
v.
QUEEN CITY BANK, N.A.; CERRITOS VALLEY BANK; PACIFIC BUSINESS BANK, Appellees.
In re: COMPTON IMPRESSIONS, LTD., a California limited partnership, Debtor.
QUEEN CITY BANK, N.A.; CERRITOS VALLEY BANK; PACIFIC BUSINESS BANK, Appellants, v.
COMPTON IMPRESSIONS, LTD., a California limited partnership, Appellee.
 No. 98-56701, No. 98-56800
 U.S. Court of Appeals for the Ninth Circuit
 Argued and Submitted April 5, 2000--Pasadena, California
Filed July 11, 2000
 
 Brian Davidoff, Rutter, O'Sullivan, Greene & Hobbs, Los Angeles, California, for Compton Impressions, Ltd., Debtor.
 Steven Casselberry, Newport Beach, California, for Queen City Bank, N.A., Cerritos Valley Bank, and Pacific Business Bank.
 Appeal from the United States District Court for the Central District of California; Edward Rafeedie, District Judge, Presiding. D.C. No. CV-97-04986-ER
 Before: Procter Hug, Jr., Chief Judge, David R. Thompson, Circuit Judge, and Jane A. Restani, Court of International Trade Judge.[1]
 THOMPSON, Circuit Judge:
 
 OVERVIEW
 
 1
 Compton Impressions, Ltd. ("Compton" or "the Debtor") obtained a $2,375,000 construction loan from Queen City Bank, N.A., Cerritos Valley Bank, and Pacific Business Bank (collectively, "the Banks") to develop a residential real estate project in Compton, California, but defaulted on the loan when the unpaid balance was $1,723,165. Compton filed for Chapter 11 reorganization in Bankruptcy. The Banks agreed to two cash-collateral stipulations to allow Compton to complete the project and attempt to sell the residential units. To assist in that endeavor, Compton employed the services of Rutter, Hobbs & Davidoff ("RH&D") as its law firm, and The Kaleson Group ("Kaleson") as its sales and marketing company, (collectively, "the Debtor's professionals"). Toward the end of the completion and sales endeavor, the Debtor brought a motion to surcharge the Banks for services rendered and expenses incurred by the RH&D law firm and by Kaleson, the sales and marketing company. The bankruptcy court denied the surcharge motion, except to the extent of $10,000 in attorney fees and costs. The Debtor appealed the bankruptcy court's denial, and the Banks cross-appealed the $10,000 award, to the district court. The district court affirmed, and this appeal followed. We have jurisdiction pursuant to 28 U.S.C. S 158(d), and we affirm.
 
 BACKGROUND
 
 2
 At the time Compton filed its Chapter 11 petition, the residential development was 80-90% complete, but only four out of twenty-four units had been sold. In its Chapter 11 petition, Compton valued the development at $3,613,800, well-above the outstanding principal balance of $1,723,165 owed to the Banks on the defaulted construction loan. Although the Banks could have sought relief from the automatic stay to begin foreclosure, Compton and the Banks agreed to a first cashcollateral stipulation so that Compton could complete, maintain, and market the development. This stipulation earmarked money to be "carved out" from the sale of each unit to be used for construction, marketing, and sales expenses, and for payments on the construction loan. The stipulation contained a number of conditions and restrictions, including: (1) a lien and payment priority for the Banks' postpetition financing; (2) the replacement of Compton's general partner; (3) a limitation on Kaleson's monthly payment;[2] (4) procedures for releasing mechanics liens; (5) a limitation on real estate and sales commissions to no more than 6%; and (6) a requirement for the Banks' approval regarding payment of expenses from operating cash.
 
 
 3
 The next year, the Banks and Compton entered into a second cash-collateral stipulation containing further conditions. In this stipulation, Compton agreed that the Banks could obtain relief from the automatic stay, allowing them to foreclose, if certain conditions were not met by a specified date. Although the conditions in fact were not met, the Banks did not then begin foreclosure. That came later. In the meantime, the Debtor continued to provide the Banks with monthly reports, as it had over the course of more than a year. Finally, when only two units remained unsold,[3] and after the Banks had received payments totaling $1,652,636 (approximately 96% of the principal balance of the loan),[4] the Debtor informed the Banks of its intention to seek payment from them, by way of a surcharge, for RH&D and Kaleson's fees and expenses.The Banks then obtained relief from the automatic stay and foreclosed on the property.
 
 
 4
 In its surcharge motion, the Debtor alleged that the Banks recovered between $179,380 and $525,253 more than they would have recovered if they had controlled the liquidation process and had used a piecemeal auction or a managed sale. Thus, according to the Debtor, although the surcharges requested were $85,107.05 for RH&D, and $168,936.78 for Kaleson, the Banks had received substantial monetary benefits from the services performed by RH&D and Kaleson, and it was only right that the Banks should pay for the services that created those benefits. The bankruptcy court disagreed. It approved only a $10,000 surcharge for RH&D's attorney fees and costs. The district court affirmed, and this appeal, and the Banks'cross-appeal, followed.
 
 ANALYSIS
 I. Standing
 
 5
 The Banks argue that the surcharge the Debtor seeks can benefit only its professionals, with no possible benefit to the Chapter 11 estate. The Banks contend that in this circumstance, 11 U.S.C. S 506(c) does not permit a surcharge motion to be brought by a Debtor.
 
 
 6
 Compton, as the debtor-in-possession, has standing to bring a S 506(c) surcharge motion. 11 U.S.C.S 1107(a). Compton owes its professionals the money that it seeks through the surcharge motion. Compton incurred its professionals' fees and expenses to preserve and dispose of the residential development that was the subject of the Chapter 11 reorganization, and a recovery of those fees and expenses would redound to the benefit of the estate's administrative creditors. We, therefore, consider Compton's S 506(c) claim on its merits.
 
 II. Compton's S 506(c) Claim
 
 7
 We apply the same standard of review to the bankruptcy court's decision as the district court did, affording the district court's decision no added weight. See In re Lazar, 83 F.3d 306, 308 (9th Cir. 1996). We apply a clearly erroneous standard to the bankruptcy court's findings of fact and review its conclusions of law de novo. See Id.
 
 
 8
 The Debtor's request for a surcharge covers the following services: (1) sales procedures and approvals required by the cash-collateral stipulation; (2) evaluation and removal of mechanics' liens; (3) title, sales, escrow, closing costs, and evaluation efforts; (4) costs associated with the surcharge motion; and (5) construction, operation, and marketing costs.
 
 
 9
 "We allow payment of administrative expenses from the proceeds of secured collateral when incurred primarily for the benefit of the secured creditor or when the secured creditor caused or consented to the expense." In re Cascade Hydraulics & Utility Serv., Inc., 815 F.2d 546, 548 (9th Cir. 1987). The controlling provision of the Bankruptcy Code is 11 U.S.C. S 506(c) which provides:
 
 
 10
 The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.
 
 
 11
 Under S 506(c), therefore, Compton must demonstrate that the expenses it seeks to surcharge against the Banks were reasonable, necessary, and beneficial to the Banks' recovery, or that the Banks caused or consented to those expenses. See Cascade Hydraulics, 815 F.2d at 548.
 
 A. Necessity and Reasonableness
 
 12
 We measure the necessity and reasonableness of the Debtor's incurred expenses against the benefits obtained for the secured creditor and the amount that the secured creditor would have necessarily incurred through foreclosure and disposal of the property. See In re Chicago Lutheran Hosp. Ass'n, 89 B.R. 719, 727 (Bankr. N.D. Ill. 1988). The threshold inquiry is whether the services for which asurcharge is sought were necessary to the secured creditor, here the Banks. We conclude they were not. Had the Banks foreclosed at the outset of the Chapter 11 proceedings, all junior liens, including mechanics liens, would have been eliminated or paid after the Banks' loan was satisfied. Moreover, the Banks could have internalized many of the post-petition costs incurred by the Debtor and its professionals simply by using in-house resources. In any event, many of the costs were incurred pursuant to the cash-collateral stipulations, and none of those costs would have been incurred had the Banks initially foreclosed on the property. To the extent any of the costs incurred pursuant to the cash-collateral stipulations were necessary to completion of the development and sale of the units, the Debtor and its professionals were paid for those services through the carve-outs in the cash-collateral stipulations. Additional expenses beyond those covered by the carve-outs merely aided the Debtor in its attempt to salvage some equity from the project; they were not necessary to the Banks, nor were they reasonably incurred insofar as the Banks' recovery was concerned.
 
 B. Benefit
 
 13
 Not only were the fees and expenses which were the subject of the surcharge motion unnecessary and unreasonable as to the Banks' recovery, the expenses did not benefit the Banks. "To satisfy the benefit test of section 506(c), [Compton] must establish in quantifiable terms that it expended funds directly to protect and preserve the collateral." Cascade Hydraulics, 815 F.2d at 548. The amount of the Banks' benefit limits Compton's recovery of expenses. See In re Jenson, 980 F.2d 1254, 1260 (9th Cir. 1992). "A debtor does not satisfy her burden of proof by suggesting hypothetical benefits." Cascade Hydraulics, 815 F.2d at 548.
 
 
 14
 The Debtor contends that it secured a concrete benefit for the Banks--namely, the return of their post-petition cash advances and approximately $1,652,636 from the sale of the units--and accomplished this for between $179,380 and $525,253 less than the Banks would have had to pay to dispose of the development. This argument misstates the case. The Banks could have fully recovered the unpaid balance of their loan if they had initially foreclosed on the property because, at that time, the Debtor valued the property at $3,613,800,[5] well-above the unpaid balance of $1,723,165 on the construction loan.
 
 
 15
 We conclude that the bankruptcy court did not clearly err in finding that the Debtor failed to meet its burden of establishing that the Banks quantifiably benefitted from the services of the Debtor's professionals, except to the extent of $10,000 as found by the bankruptcy court.
 
 C. Consent
 
 16
 The Debtor next argues that even if the services sought by the surcharge motion were not necessary, reasonable, or beneficial to the Banks' recovery, the Banks nonetheless consented to or caused the expenses by joining in the cash collateral stipulations. This argument fails. "Mere cooperation with the debtor does not make the secured creditor liable for all expenses of administration." Id. at 548. "A secured creditor's consent to the payment of designated expenses, limited in amount, is not a blanket consent to be charged with additional expenses not included in the consent agreement." Id. at 549.
 
 
 17
 Here, all the Banks did by joining in the cash-collateral stipulations was authorize restricted payments for specified items in the form of carve-outs from the sales of units in the development. Neither the Banks' joinder in the cash-collateral stipulations, nor its willingness to defer foreclosure proceedings, caused the Debtor toincur the expenses sought by the surcharge motion. The Banks did nothing more than cooperate with the Debtor in its attempt to salvage some equity from the development. The bankruptcy court did not clearly err in finding that the Banks did not cause or consent to the expenses the Debtor sought to recover by its surcharge motion.
 
 III. The Banks' Cross-Appeal
 
 18
 The bankruptcy court granted the Debtor $7000 in attorneys fees and $3000 in costs pursuant to its S 506(c) motion. The Banks contend that the bankruptcy court's findings are insufficient to support this $10,000 surcharge. We disagree. The bankruptcy court's findings refer to the $10,000 award as being based on "the extent that debtor's counsel may have facilitated the sales of the properties." This is sufficient to satisfy the specificity required by Cascade Hydraulics. See Cascade Hydraulics, 815 F.2d at 549.
 
 CONCLUSION
 
 19
 The district court's order, affirming the bankruptcy court's order, denying the Debtor's surcharge motion, except to the extent of a $10,000 surcharge against the Banks, is AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 Honorable Jane A. Restani, Judge, United States Court of International Trade, sitting by designation.
 
 
 [2]
 The agreement limited Kaleson's payment to $5000 per month for the first two months and $3500 per month for the next ten months.
 
 
 [3]
 The Debtor estimates that the Banks would have received an additional $170,000 from the sale of these two remaining units.
 
 
 [4]
 This amount reflects only the principal balance owed to the Banks and does not include any post-petition interest.
 
 
 [5]
 Several months later, the Debtor reduced its estimate of the value of the property to $3,424,000 for a "rapid sale. " Either amount, however, would have resulted in the Banks being fully compensated.