**In re MACHINERY, INC., Debtor.**

**General Electric Capital, Corp., Movant.**

**No. 01–43526–293.**

United States Bankruptcy Court, E.D. Missouri, Eastern Division.

Dec. 11, 2002.

Steven Goldstein, Goldstein and Pressman, Anthony Soukenik, St. Louis, MO, for debtor.

## *MEMORANDUM OPINION*

DAVID P. McDONALD, Bankruptcy Judge.

This case is before the Court on General Electric Capital's ("GE Capital") Motion for Summary Judgment and Debtor's Cross Motion for Summary Judgment to determine the value of GE Capital's secured and total claim against Debtor's estate under 11 U.S.C. § 506(a). The undisputed facts contained in the affidavits submitted by the parties demonstrate that the value of GE Capital's secured claim includes the proceeds generated from Debtor's lease of aerial lifts (the "Lifts") during the pendency of the bankruptcy case. Also, the undisputed facts indicate that Debtor may surcharge the reasonable expenses it incurred in operating its business during the pendency of the case under § 506(c). Further, the undisputed facts reveal that the total value of GE Capital's claim against Debtor's estate is $2,948,160.77.

There are material questions of fact in dispute, however, as to the amount of cash that Debtor remitted to GE Capital during the pendency of the bankruptcy case. Therefore, there is a genuine dispute of material fact concerning the value of GE Capital's secured claim and total claim as of the confirmation date. Accordingly, both motions will be granted in part and denied in part.

## *JURISDICTION AND VENUE*

This Court has jurisdiction over the parties and subject matter of this proceeding under 28 U.S.C. §§ 1334, 151, and 157 and Local Rule 9.01(B) of the United States

District Court for the Eastern District of Missouri. This is a core proceeding under 28 U.S.C. § 157(b)(2)(B), which the Court may hear and determine. Venue is proper in this District under 28 U.S.C. § 1409(a).

### PROCEDURAL & FACTUAL BACK-GROUND

Debtor is in the business of leasing the Lifts to end users during construction projects. GE Capital and Debtor entered into a floor plan financing and security agreement (the "Agreement") in November 1997. Under the terms of the Agreement, GE Capital agreed to loan Debtor up to $5,000,000 to finance Debtor's purchase of the Lifts. Debtor granted GE Capital a security interest in substantially all of its assets, including the Lifts and proceeds from the Lifts. GE Capital perfected this security interest and its interest is senior to any other party's interest in the collateral.

Debtor filed a petition for relief under Chapter 11 of the United States Bankruptcy Code on March 29, 2001. Debtor was unable to secure debtor in possession financing pursuant to 11 U.S.C. § 364 to fund its continued operation. Accordingly, Debtor filed a motion on April 2, 2001 to allow it to use GE Capital's cash collateral to finance its business operations. GE Capital did not object to Debtor's motion to use the cash collateral.

This Court granted Debtor's motion to use GE Capital's cash collateral and issued a series of cash collateral orders on April 3, 2001, May 2, 2001 and June 5, 2001, (collectively the "Cash Collateral Orders"). The Cash Collateral Orders directed Debtor to pay GE Capital 60 percent of the revenue generated from the rental of the Lifts. The Cash Collateral Orders also granted GE Capital adequate protection for Debtor's use of the cash collateral by granting a replacement lien on all of the assets of the Debtor's bankruptcy estate in favor of GE Capital to the extent Debtor used the cash collateral.

GE Capital filed its proof of claim against Debtor's estate on June 29, 2001, in the amount of $2,948,160.77. Debtor generated $748,335.21 in proceeds from the lease of the Lifts during the pendency of its bankruptcy case. Accordingly, Debtor remitted approximately $449,001.13 to GE Capital and retained $299,334.08 pursuant to the cash collateral order. Further, Debtor remitted the proceeds from its sale of certain inventory in which GE Capital had a security interest to GE Capital (the "Sale Proceeds"). The parties, however, submitted conflicting affidavits as to the exact amount Debtor remitted to GE Capital from the Sale Proceeds. Debtor claims that it remitted $151,560.75 to GE Capital (Affidavit of Kopp, ¶ 3(d)) while GE Capital asserts that it only received $85,274.00. (Affidavit of Steve Kopitskie ¶ 8).

Debtor filed its proposed plan of reorganization on July 27, 2001, and then an amended plan on August 28, 2001 (the "Amended Plan"). Under the Amended Plan, Debtor would retain the Lifts and pay in full the secured portion of GE Capital's claim. Debtor also stated in the Amended Plan that it believed that the value of GE Capital's secured claim under 11 U.S.C. § 506(a) was $1,700,000. Thus, Debtor treated GE Capital as an unsecured creditor under the Plan.

GE Capital then filed a motion with this Court on September 14, 2001, to determine the value of its secured claim under 11 U.S.C. § 506(a) with respect to the Lifts, the proceeds of the Lifts and the replacement lien this Court granted it under the Cash Collateral Orders. GE Capital asserted in its motion that the value of the Lifts was $2,613,000, the value of the accounts receivables attributable to the Lifts was $241,981 and the value of the lien the

Court granted to it under the Cash Collateral Orders was $243,653.75. Therefore, GE Capital contended that the aggregate value of its secured claim against Debtor's estate was $3,098,634.75.

Debtor responded to GE Capital's motion by asserting the value of the Lifts was $1,668,000.00. Debtor also argued in its response that GE Capital's lien with respect to receivables generated from the lease of the Lifts should be no more that the value of those receivables on the petition date, which was approximately $139,000. Further, Debtor stated that any payment it made to GE Capital during the course of bankruptcy should be subtracted from the value of GE Capital's secured claim. Additionally, Debtor maintained that it was entitled to surcharge the value of the receivables by the amount it expended to generate those receivables under 11 U.S.C. § 506(c). Debtor's calculation of the aggregate value of GE Capital's secured claim, after deduction of all payments Debtor made to GE Capital during the pendency of the bankruptcy, was $1,318,940.

This Court held an evidentiary hearing on GE Capital's motion on September 24, 2001. The Court, following the Supreme Court's ruling in *Assoc. Comm. Corp. v. Rash*, 520 U.S. 953, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997), found that the replacement value of the Lifts was equal to $1,668,000.00. Accordingly, the Court found that the value of GE Capital's secured claim under § 506(a) with respect to the Lifts was $1,668,000.

At the parties' request, the Court delayed ruling on the value of GE Capital's secured claim with respect to the replacement it was granted in the Cash Collateral Orders and the proceeds of the Lifts so that the parties could conduct additional discovery with respect to the value of those two items. GE Capital also appealed the Court's valuation of the Lifts. The Bankruptcy Appellate Panel for the Eighth Circuit, however, dismissed the appeal as interlocutory because this Court had yet to value GE Capital's secured claim with respect to its interest in the proceeds of the Lifts. *General Elec. Capital Corp. v. Machinery, Inc. (In re Machinery, Inc.)*, 275 B.R. 303, 306 (8th Cir. BAP 2002).

GE Capital voted against the Amended Plan and filed an objection to its confirmation. The Court conducted a hearing on confirmation of the Amended Plan on October 3, 2001. At the hearing, GE Capital agreed to withdraw its objection to confirmation of the Amended Plan in exchange for Debtor revising the Amended Plan by including a provision that would preserve the secured creditors' right to challenge Debtor's valuation of the various creditors' secured claims at a later date.

Pursuant to the compromise between Debtor and GE Capital, Debtor filed a revised amended plan of reorganization (the "Revised Plan") on October 4, 2001. Paragraph 3.8 required Debtor to file a statement that listed the value of each creditor's secured claim after deducting the payments that Debtor had already remitted to the creditor. Further, Paragraph 3.8 recites that Debtor would make payments to the secured creditors under the Revised Plan based on the amount listed in Debtor's statement. Paragraph 3.8 provided that each creditor would then have sixty days to objection to the amount of its secured claim listed on Debtor's statement. The Court confirmed the Revised Plan on October 5, 2001.

Pursuant to Paragraph 3.8 of the Revised Plan, Debtor filed its statement listing the value of the creditor's secured claim on October 19, 2001. In the statement, Debtor listed the value of GE Capital's secured claim at $1,087,437.93 after

deducting the payments it remitted to GE Capital. GE Capital filed an objection to Debtor's valuation of its secured claim on December 18, 2001. GE Capital filed the instant motion for summary judgment under Fed.R.Civ.P. 56, made applicable to this contested matter pursuant to Fed. R. Bankr.P. 9014. Debtor filed its cross-motion for summary judgment on GE Capital's motion to determine the value of its secured claim as well as a motion for summary judgment to surcharge the value of the proceeds of the Lifts by the reasonable and necessary cost of producing the proceeds. Union Planters Bank ("Union Planters"), who holds a junior security interest in Debtor's assets, also filed a response to GE Capital's motion for summary judgment.[1] The parties also stipulated that there was no genuine dispute as to any material fact so that the Court could resolve all outstanding issues by way of summary judgment.

GE Capital asserts in its motion for summary judgment that the value of its secured claim includes the full amount of proceeds of the Lifts generated during the pendency of Debtor's bankruptcy. Also, GE Capital does concede that the amount Debtor remitted to it under the Cash Collateral Orders and Sale Proceeds should be deducted from the value of its secured claim as of the confirmation date.

Debtor counters by arguing that the value of GE Capital's secured claim was fixed as of the petition date and therefore, the proceeds did not enhance the value of GE Capital's secured claim. Further, Debtor maintains that it is entitled to surcharge GE Capital's secured claim by the amount it expended in generating the proceeds of the Lifts either under § 506(c) or § 552(b).

The Court finds that GE Capital's secured claim includes the value of all the proceeds generated post-petition as a matter of law. Also, under Eighth Circuit precedent, Debtor is allowed to surcharge the value of GE Capital's secured claim under § 506(c) by the amount Debtor expended in continuing to operate its business during the pendency of the case. There is, however, a genuine issue of material facts as to the amount of Sales Proceeds that Debtor remitted to GE Capital. Thus, both the motions of GE Capital and Debtor will be granted in part and denied in part.

## DISCUSSION

### A. Standard for Summary Judgment

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Freyermuth v. Credit Bureau Serv., Inc.,* 248 F.3d 767, 770 (8th Cir.2001); Fed. R.Civ.P. 56(c).

If the movant fails to establish that it is entitled to judgment as a matter of law under Rule 56(c) but does establish that there are no genuine issues of fact as to some of the issues in its case, the Court may grant the motion for summary judgment in part and enter an order establishing what issues are without substantial controversy. *Kansas Nat'l Bank & Trust v. Kroh (In re Kroh),* 88 B.R. 972, 975 (Bankr.W.D.Mo.1988); Fed.R.Civ.P. 56(d). The issues the court identifies as without substantial controversy under Rule 56(d) shall be deemed conclusively established for purposes of subsequent litigation. *Lind v. United Parcel Serv.,* 254 F.3d 1281, 1284 n. 4 (11th Cir.2001).

Here, as illustrated below, there is a genuine dispute as to the amount of Sales Proceeds Debtor remitted to GE Capital

---

**1.** Union Planters has a right to be heard on this matter pursuant to 11 U.S.C. § 1109(b).

during the pendency of the case. Thus, neither party is entitled to judgment as a matter of law under Rule 56(c). GE Capital, however, has established that the value of its secured claim includes the full amount of the post-petition proceeds. Also, Debtor has established that it is entitled to surcharge GE Capital's secured claim by the reasonable expenses it incurred in operating the business. Thus, the court will enter partial summary judgment under Rule 56(d) as to those issues.

## B. The Value of the Lifts

As discussed above, this Court has previously valued the Lifts at $1,668,000 after conducting an evidentiary hearing on the matter. David E. Runck, attorney for GE Capital, submitted an affidavit on July 24, 2002, in support of GE Capital's motion for summary judgment. In Paragraph 4 of his affidavit, Runck states that the value of the Lifts is at least $1,909,152. Runck premises his valuation by taking the net income generated by the Lifts from April 2001 through September 2001, extrapolating that amount over a five year period and then reducing the resulting product to present value. (Affidavit Runck, ¶ 4).

■ Debtor filed a motion to strike Paragraph 4 of Runck's affidavit under Rule 56(e) because it is not based on facts that would be admissible and fails to demonstrate that Runck is competent to testify as to the value of the Lifts. The Court will grant Debtor's motion to strike.

■ Runck valued the Lifts by utilizing the discounted cash flow method. Under the discounted cash flow method, an asset's value is estimated by projecting the net cash flow that the asset will generate, typically over a five year period, then reducing that number to present value. *See* Jay W. Eisenhofer & John L. Reed, *Valuation Litigation*, 22 DEL. J. CORP. L. 37, 113 (1997). It is true that the discounted cash flow method is a proper way of valuing an asset under certain circumstances. For example, the discounted cash flow method is an acceptable manner of valuing the equity of a closely held corporation that has very few comparable publicly traded competitors to gauge the market value of the equity. *See e.g. Westpointe L.P. v. Prairie Properties, L.L.C.*, 241 F.3d 1005, 1007–08 (8th Cir.2001). Here, however, Runck's valuation of the Lifts based on a discounted cash flow analysis is improper for two reasons.

First, Runck's affidavit failed to affirmatively demonstrate that he is competent to testify to the valuation of the Lifts by utilizing the discounted cash flow method. In his affidavit, Runck simply extrapolated net earnings from the Lifts for a five month period over a five year period. Clearly, only an expert in the lift market can establish a sufficient evidentiary basis that would support such an extrapolation. *See In re Zenith Elec. Corp.*, 241 B.R. 92, 103 (Bankr.D.Del.1999); Fed.R.Evid. 702.

There is nothing in Runck's affidavit that would suggest that he is qualified to give expert testimony relating to the lift market. Accordingly, he is not competent to testify as to whether it is proper to extrapolate the net income for the Lifts for five months over a five year period. Therefore, Runck is simply not competent to testify as to whether it is appropriate to extrapolate the net income generated by the leasing of the Lifts. Thus, Paragraph 4 of his affidavit is not proper under Rule 56(e).

■ The second reason why Runck's affidavit must be stricken is because the discounted cash flow valuation is irrelevant in the instant case. As mentioned above, the Court has previously valued the Lifts for the purpose of determining the value GE Capital's secured claim with respect to

the Lifts under § 506(a). As this Court's previous order on the value of the Lifts outlines, and both parties agree, when a debtor retains the collateral, *Rash* dictates that the value of the collateral for purposes of determining the creditor's secured claim under § 506(a) is the cost the debtor would have to expend to replace the collateral in the open market. Thus, if an active market for the collateral exists, the replacement value of the collateral should be determined by the market price of the collateral instead of the discounted cash flow method, which uses projected net income. *See United States v. Arnold & Baker Farms (In re Arnold & Baker Farms)*, 177 B.R. 648, 657 (9th Cir. BAP 1994) *citing* Financial Accounting Standards Board Statement No. 15.

At the hearing on the value of the Lifts, Debtor established that there was an active market for used aerial Lifts. Also, Debtor demonstrated that the market was sufficiently strong so that it could replace its inventory of aerial Lifts by purchasing such replacements at auction. Even GE Capital's valuation expert at the hearing did not rely on the discounted cash flow method in valuating the Lifts but rather relied upon an estimated retail market price.

Because an active market exists for the Lifts in question, the market price for the Lifts, not the discounted cash flow valuation of the Lifts, is the only relevant value in determining the value of GE Capital's secured claim with respect to the Lifts under § 506(a). Accordingly, the discounted cash flow method valuation is not relevant under *Rash* and would not be admissible at a trial in determining the replacement cost of the Lifts. Therefore, even if Runck somehow demonstrated that he was competent to extrapolate the five month net income figure over a five year period, his valuation of the Lifts contained in Paragraph 4 of his affidavit would still be improper under Rule 56(e). Thus, Debtor's motion to strike Runck's affidavit is granted as to Paragraph 4.

### B. Components of GE Capital's Secured Claim

#### 1. Introduction

This Court has previously determined that the value of the Lifts was $1,668,000. Also, GE Capital's secured claim includes the proceeds of the lifts generated post-petition under § 552(b)(1). Also, Section 506(c) allows Debtor to deduct the reasonable expenses it incurred in operating the business from GE Capital's secured claim.

#### 2. GE Capital's Secured Claim Includes the Proceeds Generated Post–Petition

■ Courts have adopted three different approaches in analyzing what effect post-petition proceeds have upon a creditor's secured claim. The first approach denominated the single valuation approach, advanced by Debtor and accepted by a minority of courts, holds that the value of the creditor's secured claim is fixed as of the petition date. *See e.g. In re Reddington/Sunarrow, Ltd.*, 119 B.R. 809, 813 (Bankr.D.N.M.1990). Under this line of cases, any proceeds generated post-petition cannot increase the value of the creditor's secured claim. *Id.*

The second line of cases, which GE Capital advocates, called the continuous valuation approach, holds that for purposes of valuing a creditor's secured claim, the Court must value the collateral securing the creditor's claim at the time the plan is confirmed. *See e.g. In re Union Meeting Partners*, 178 B.R. 664, 675–76 (Bankr. E.D.Pa.1995). These cases hold that provided that the creditor has a valid security interest in proceeds, any proceeds generated post-petition increase the value of the creditor's secured claim. *Id.*

The third approach, supported here by Union Planters, labeled the dual evaluation method, reasons that the court should value the creditor's secured claim for purposes of adequate protection as of the petition date and the date of confirmation for purposes of determining the actual value of the secured claim for confirmation purposes. *See e.g. In re Addison Properties L.P.*, 185 B.R. 766, 772 (Bankr.N.D.Ill. 1995). Here, the parties agreed to GE Capital's adequate protection by consenting to the Cash Collateral Orders. Thus, because an agreed cash collateral order is binding, the parties may not reargue the adequate protection provided to GE Capital in the Cash Collateral Orders. *In re Bloomingdale Partners*, 155 B.R. 961, 976 (Bankr.N.D.Ill.1993). Accordingly, for purposes of the issue presented here, the value of GE Capital's secured claim under the Revised Plan, the dual evaluation method is identical to the continuous valuation method. *See Addison Properties*, 185 B.R. at 784 (noting that under the dual evaluation approach any proceeds generated post-petition increase the value of the creditor's secured claim for confirmation purposes).

A bankruptcy Court within this District has previously adopted the continuous valuation method in analyzing the effect that post-petition proceeds have upon a creditor's secured claim. *See In re Veeco Inv. Co.*, 170 B.R. 149 (Bankr.E.D.Mo.1994). In *Veeco* the Court held that when a creditor holds a pre-petition perfected security interest in proceeds, under § 552(b)(1) any proceeds generated post-petition constitutes a separate piece of collateral and increases the value of the creditor's secured claim. *Id.* at 153. Debtor first argues that *Veeco* is inapposite to the disposition of the instant case because the creditor in *Veeco* was oversecured while GE Capital is admittedly undersecured

here. This distinction, however, is meaningless under § 552(b)(1).

Section 552(b)(1) reads in relevant part: "if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds... then such security interest extends to such proceeds... acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law..."

There is nothing in the language of § 552(b)(1) that differentiates between fully secured and undersecured creditors. In fact, the only reason why the creditor in *Veeco* was oversecured was that the Court found that the proceeds generated post-petition increased the value of its secured claim above the amount of its total claim. *Id.* at 152. If the *Veeco* Court would not have applied the post-petition proceeds to the creditor's secured claim, the creditor would have been undersecured. *Id.* Accordingly, the fact that GE Capital is undersecured is irrelevant to whether its secured claim includes the proceeds generated post-petition under § 552(b)(1). *See also Beal Bank v. Waters Edge L.P.*, 248 B.R. 668, 686 (D.Mass. 2000).

Debtor also maintains, rather curiously, that *Veeco* did not adopt the continuous valuation method. This conclusion is a misunderstanding of the Court's opinion in *Veeco*. In *Veeco*, the creditor had a valid security interest in a shopping center and proceeds from the shopping center. *Id.* at 150. The shopping center was valued at $7,400,000 and generated proceeds of $1,280,000 post-petition. *Id.* Also, the debtor paid the creditor the entire

$1,280,000 in post-petition proceeds during the pendency of the case. *Id.* at 151.

The creditor asserted that its secured claim included the proceeds and that the payments that the debtor made to it did not reduce its overall claim against the estate. *Id.* at 151–52. Thus, the Court addressed two issues: 1) did the creditor's secured claim include the post-petition proceeds and 2) what effect did debtor's payment of the post-petition proceeds have upon the creditor's claim. As outlined above, in addressing the first issue, the Court unequivocally held that under § 552(b)(1), the creditor's secured claim included both the value of the shopping center and the post-petition proceeds. *Id.* at 151–53. Thus, once the proceeds were generated post-petition, it increased the value of the creditor's secured claim. *Id.* at 152.

In addressing the second issue, the Court noted that as soon as the debtor paid the proceeds to the creditor, there was a corresponding decrease in the secured claim. *Id.* at 152. Debtor argues that this portion of the holding in *Veeco* is a rejection of the continuous valuation method. That portion of the opinion, however, is simply an observation that the secured creditor had to credit the debtor for its payment of the proceeds during the pendency of the bankruptcy. Accordingly, the portion of the *Veeco* opinion cited by Debtor does not address the issue of whether the post-petition proceeds increase the value of the creditor's secured claim. Rather, as illustrated above, the portion of the opinion that discusses that issue specifically finds that the post-petition proceeds increase the value of the secured claim. Therefore, *Veeco* does follow the continuous valuation approach.

Debtor argues in the alternative that this Court should not follow *Veeco* but rather adopt the single valuation method.

The Court will not depart from *Veeco's* continuous valuation approach because the single valuation method is contrary to the plain language of §§ 552(b)(1) and 506(a) and is inconsistent with the policy objectives underlying the Code as articulated by the Supreme Court in *Dewsnup v. Timm,* 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992).

As illustrated above, the plain language of § 552(b)(1) clearly dictates that a pre-petition security interest in proceeds encumbers post-petition proceeds. Thus, the vast majority of cases have held that under § 552(b)(1), post-petition proceeds constitute separate collateral apart from the underlying asset that generates the proceeds. *See e.g. Veeco,* 170 B.R. at 153; *Beal Bank v. Waters Edge L.P.,* 248 B.R. 668, 686 (D.Mass.2000); *In re Homestead Partners,* 200 B.R. 274, 282 (Bankr.N.D.Ga.1996); *In re Duval Manor Assoc.,* 191 B.R. 622, 634 (Bankr.E.D.Pa.1996); *In re Addison Properties L.P.,* 185 B.R. 766, 784 (Bankr. N.D.Ill.1995); *In re Union Meeting Partners,* 178 B.R. 664, 675–76 (Bankr.E.D.Pa. 1995); *In re Bloomingdale Partners,* 155 B.R. 961, 975–76 (Bankr.N.D.Ill.1993).

Because the single valuation method does not include post-petition proceeds in the value of the creditor's secured claim, that method simply invalidates the creditor's security interest in post-petition proceeds under § 552(b)(1). *Veeco,* 170 B.R. at 153; *Bloomingdale Partners,* 155 B.R. at 976; David Gray Carlson, *Adequate Protection Payments and the Surrender of Cash Collateral in Chapter 11 Reorganization,* 15 CARDOZO. L. REV. 1357, 1379–80 (1994). Therefore, the single valuation method is contrary to the plain language of § 552(b)(1).

Debtor further maintains that despite the plain language of § 552(b)(1), an interpretation of § 552(b)(1) that allows a creditor's secured claim to increase post-peti-

tion is violative of the Supreme Court's ruling in *United Savings Assoc. v. Timbers of Inwood Forest Assoc.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). Debtor argues that *Timbers* stands for the proposition that a debtor's secured claim cannot increase because of post-petition events. *Timbers*, however, addressed the issue of whether an undersecured creditor is entitled to adequate protection under § 362(d)(1) for the debtor's use of the collateral during the pendency of the bankruptcy. *Id.* at 369–70, 108 S.Ct. 626. The Supreme Court held that because an undersecured creditor is not entitled to receive interest on its claim under § 506(b), it is not entitled to adequate protection for the debtor's use of the collateral during the pendency of the bankruptcy. *Id.* at 372–73, 108 S.Ct. 626.

Here, the issue of whether GE Capital is entitled to adequate protection has already been agreed to by the parties in the stipulated Cash Collateral Orders. The issue before the Court is whether the value of a secured claim includes the post-petition proceeds of the underlying collateral. The answer to that question is simply outside the scope of the holding in *Timbers*. *Beal Bank*, 248 B.R. at 686; *Homestead Partners*, 200 B.R. at 281; *Veeco*, 170 B.R. at 153.

Further, although the Court's holding in *Timbers* does not address the issue presented here, the Court did observe in *dicta* that a secured creditor may satisfy its claim from post-petition proceeds if it complied with the provisions of § 552(b)(1). *Timbers*, 484 U.S. at 374, 108 S.Ct. 626. Debtor attempts to argue that this *dicta* in *Timbers* merely stands for the proposition if the creditor has complied with § 552(b)(1), although the value of its secured claim is unaffected by post-petition of proceeds, it is entitled to satisfy its secured claim from those proceeds before

the unsecured creditor has a right to those proceeds. The Court must reject Debtor's argument.

A debtor in possession is already required under the absolute priority rule, 11 U.S.C. § 1129(b)(2)(C)(ii), to pay the secured claims before it pays the unsecured claims regardless of whether the secured creditor has complied with the provisions of § 552(b)(1). Thus, Debtor's interpretation of the Supreme Court's *dicta* would render § 552(b)(1) superfluous in a Chapter 11. Therefore, a much more natural reading of the Supreme Court's *dicta* in *Timbers* is that if the creditor has a valid security interest in post-petition proceeds under § 552(b)(1), the value of its secured claim includes those proceeds. *Homestead Partners*, 200 B.R. at 280–81; *Union Meeting Partners*, 178 B.R. at 676; *Bloomingdale Partners*, 155 B.R. at 976.

Section 506(a) also requires that a bankruptcy court utilize the continuous valuation method in analyzing whether a creditor's secured claim includes post-petition proceeds. Section 506(a) recites that the bankruptcy court must value a creditor's interest in the estate's property in light of the purpose of such valuation. Also, the value of a creditor's secured claim must be determined as of the effective date of the plan for confirmation related issues. *Prudential Ins. Co. v. Monnier Bros. (In re Monnier Bros.)*, 755 F.2d 1336, 1339 (8th Cir.1985). Therefore, because the continuous valuation method takes into consideration the secured party's interest in post-petition proceeds, it properly values the creditor's security interest at the time of confirmation. *Homestead Partners*, 200 B.R. at 281. Accordingly, the continuous valuation method values the creditor's secured claim in light of the purpose of the valuation as required by § 506(a). *Id.*

Finally, the continuous valuation approach is also supported by the policy

rationale articulated by the Supreme Court in *Dewsnup v. Timm*, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992). In *Dewsnup* the Court held that a debtor cannot "strip down" a lien under § 506(d) in a Chapter 7 case. The Court premised its holding in part on a policy consideration that any increase in the value of collateral during the pendency of the bankruptcy accrues to the secured creditor, not the debtor or unsecured creditor. *Id.* at 417, 112 S.Ct. 773. Also, the Court noted that the value of a creditor's security interest should not be judicially frozen at some particular point in time during the pendency of the bankruptcy. *Id.*

Although the holding is *Dewsnup* is not germane to the issue presented here, the policy rationale articulated by the Court strongly implies that the value of a creditor's secured claim may increase during the pendency of the bankruptcy case. *Beal Bank*, 248 B.R. at 686; David Gray Carlson, *Bifurcation of Undersecured Claims in Bankruptcy*, 70 AM. BANKR. L.J. 1, 30 (1996). Therefore, any valuation method that freezes the value of the secured creditor's claim as of the petition date is contrary to the policy rationale articulated in *Dewsnup*. Accordingly, applying the single valuation approach in determining whether post-petition proceeds increase the value of a secured creditor's claim under § 552(b) undermines bankruptcy policy articulated by the Court in *Dewsnup*. *See Id.*

*3. Under the Cash Collateral Order GE's Secured Claim includes the Proceeds Consumed by Debtor*

■ Union Planters argues that to the extent that Debtor consumed the cash collateral, GE Capital's security interest in the cash proceeds was vitiated under § 552(b)(1). Section 552(b)(1) states that the creditor's security interest in proceeds is valid with respect to post-petition proceeds to the extent such interest is valid under applicable nonbankruptcy law. Here, Union Planters argues that once Debtor consumed the 40 percent of the proceeds it retained under the Cash Collateral Orders, GE Capital's security interest in those proceeds was no longer valid under applicable nonbankruptcy law, Article 9 of the Uniform Commercial Code. Even assuming *arguendo* that Union Planters' interpretation of Article 9 is correct, its argument still fails.

■ Under the Cash Collateral Orders, GE Capital was granted a replacement lien as adequate protection under § 363(e) to the extent Debtor utilized the cash collateral. Thus, although GE Capital may not have had a valid state law security interest in the proceeds that Debtor consumed, the Cash Collateral Orders granted GE Capital a valid senior security interest in Debtor's other assets as adequate protection to the extent that Debtor consumed the proceeds. In fact, the primary function of providing a secured creditor with adequate protection in a cash collateral order under § 363(e) is to protect the secured creditor's interest in the cash collateral when the debtor consumes the cash. *Armstrong World Indus. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 397 n. 3 (S.D.N.Y.1983). Accordingly, even if Debtor's use of the cash collateral destroyed GE Capital's state law security interest in the proceeds, GE Capital obtained a replacement lien in that exact amount under the Cash Collateral Orders.

*4. Effect of the Cash Collateral Debtor Paid to GE Capital Post–Petition*

■ The next question the Court must address is how to apply the 60 percent of the proceeds Debtor paid GE Capital pursuant to the Cash Collateral Orders.

Under the continuous valuation method adopted above, the value of GE Capital's

secured claim includes the proceeds of the Lifts generated post-petition. Thus, any payment of the post-petition proceeds to the creditor during the pendency is a pre-payment on the secured claim. *In re Union Meeting Partners,* 178 B.R. 664, 676–77 (Bankr.E.D.Pa.1995); *In re Bloomingdale Partners,* 155 B.R. 961, 976 (Bankr. N.D.Ill.1993). Thus, the increase in the creditor's claim when the proceeds are generated coupled with the corresponding decrease once the debtor pays the proceeds results in a "wash" so that the value of the secured claim remains constant to the extent that debtor paid the proceeds to the creditor. *Union Partners,* 178 B.R. at 664 n. 8; *See also* Carlson, 15 CARDOZO L. REV. at 1379.

*5. Debtor may Surcharge GE Capital's Secured Claim under § 506(c)*

■ Debtor argues that it may surcharge GE Capital's secured claim under either § 506(c) or the equities of the case clause contained § 552(b)(1). Section 552(b)(1) explicitly subjects the extension of a creditor's pre-petition security interest in proceeds to proceeds generated post-petition to § 506(c). Thus, a court should first examine whether the debtor may surcharge the creditor's security interest in post-petition proceeds under § 506(c) before addressing the equities of the case exception under § 552(b)(1) itself. *See In re Willingham Inv.,* 203 B.R. 75, 79–80 (Bankr.M.D.Tenn.1996); *George v. FHA (In re George),* 62 B.R. 671, 673 (Bankr. C.D.Ill.1986). Because Debtor may surcharge GE Capital's secured claim with respect to the post-petition proceeds under § 506(c), the Court will limit its analysis to that section.

■ Generally, administrative expenses may not be charged against a secured creditor's claim. *Hartford Underwriters Ins. v. Magna Bank (In re Hen House Interstate, Inc.),* 150 F.3d 868, 871 (8th Cir.1998) *rev'd on other grounds* 150 F.3d 868 (8th Cir.1998) *(en banc) aff'd.* 530 U.S. 1, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000). Section 506(c), however, provides an exception to the general rule. *Id.*

■ Section 506(c) states: "The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." Thus, the text of § 506(c) allows a debtor to surcharge a secured claim if it can demonstrate that the administrative expense was necessary, reasonable and directly benefitted the secured party. *Hartford Fire Ins. Co. v. Norwest Bank (In re Lockwood Corp.),* 223 B.R. 170, 175 (8th Cir. BAP 1998). Courts have also held that a debtor in possession may surcharge a secured creditor's claim under § 506(c) when the secured creditor either directly or impliedly consents to the expense. *Hen House,* 150 F.3d at 871. Here, the Court finds that GE Capital impliedly consented to Debtor surcharging GE Capital's secured claim by the reasonable and necessary expenses that Debtor incurred in operating the business during the pendency of the bankruptcy.

As discussed above, GE Capital consented to the Cash Collateral Orders, which allowed Debtor to use GE Capital's cash collateral to finance its continued operation. GE Capital contends that it did not consent to a surcharge by merely cooperating with Debtor in consenting to the Cash Collateral Orders. Debtor and Union Planters argue that GE Capital impliedly consented to Debtor surcharging its expenses in operating its business against GE Capital's secured claim by consenting to Debtor's use of its cash collateral The Court agrees with Debtor and Union Planters' position.

The Court notes that the majority rule is that a secured creditor does not impliedly consent to the debtor surcharging the administrative expenses of operating the business against its secured claim by merely consenting to the debtor's use of its cash collateral. *See Compton Impressions, Ltd. v. Queen City Bank (In re Compton Impressions, Ltd.)*, 217 F.3d 1256, 1261–62 (9th Cir.2000); *Harvis Trien & Beck v. Federal Home Loan Mortgage Corp. (In re Blackwood Assoc.)*, 153 F.3d 61, 68 (2d Cir.1998). The Eight Circuit, however, has adopted a much more liberal approach in examining this issue.

■ Under the Eighth Circuit's approach, if a secured creditor consents to the debtor's continued operation, it also impliedly consents to the debtor surcharging the necessary operating expenses of continuing its business against the creditor's secured claim. *Hen House*, 150 F.3d at 871–72; *United States v. Boatmen's First Nat'l. Bank*, 5 F.3d 1157, 1159–60 (8th Cir.1993) *overruled on other grounds*, 150 F.3d 868 (8th Cir.1998) *(en banc) aff'd.* 530 U.S. 1, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000). This is particularly true when the cash collateral order expressly provides that debtor may use the cash collateral to finance its operating expenses. *Hen House*, 150 F.3d at 872.

GE Capital contends that *Hartford Fire Ins. Co v. Norwest Bank (In re Lockwood Corp.)*, 223 B.R. 170 (8th Cir. BAP 1998) stands for the proposition that a secured creditor does not consent to the surcharging of its secured claim by merely cooperating with the debtor. In *Lockwood*, the Bankruptcy Appellate Panel noted in a footnote that courts should not hastily draw inferences of a secured creditor's consent to surcharge its secured claim. *Id.* at 175 n. 6. The Bankruptcy Appellate Panel, following the majority rule, also

stated that the secured creditor's mere cooperation with the debtor does not make it liable for all administrative expenses. *Id.*

The Court agrees that footnote six of *Lockwood* supports GE Capital's position. The Court, however, also notes that the Bankruptcy Appellate Panel's analysis of the consent issue was in *dicta*. Further, the *Lockwood* Court's treatment of the consent issue is contrary to the Eighth Circuit's opinion in both *Boatmen's* and *Hen House*. As outlined above, the holding of both of those cases requires a finding that the secured creditor does in fact impliedly consent when it agrees to the debtor's continued operation of its business. Therefore, the Court will not follow the *dicta* in *Lockwood* relating to the consent issue.

GE Capital also maintains that even if Debtor may surcharge its secured claim under § 506(c), it may only surcharge for the expenses directly attributable to the generation of the post-petition proceeds. GE Capital argues that only the expenses directly attributable to generating the post-petition proceeds directly benefitted it by increasing the value of its secured claim.

The Eighth Circuit, however, has held that in consent cases, the secured creditor's benefit from the debtor's continued operation of business is the opportunity to improve its position during the pendency of the bankruptcy. *Boatmen's*, 5 F.3d at 1160. Therefore, the secured creditor must accept the costs and risks associated with that benefit. *Id.; Hen House*, 150 F.3d at 872. Accordingly, the secured creditor must bear the cost of the necessary administrative expenses that the debtor incurs in operating the business. *Boatmen's*, 5 F.3d at 1159–60; *Hen House*, 150 F.3d at 872. For example, the Eighth Circuit found that the secured creditor was

liable for worker's compensation insurance premiums in *Hen House* and payroll taxes in *Boatmen's,* both of which are clearly general operating expenses.

Here, the various cash collateral orders expressly allowed for Debtor to utilize GE Capital's cash collateral to finance its continued operation in accordance with a stipulated budget. Thus, under *Boatmen's* and *Hen House,* GE Capital impliedly consented to the surcharging of Debtor's necessary expenses incurred in operating the business by consenting to the Cash Collateral Orders.

5. *Calculating GE Capital's Secured Claim*

GE Capital's secured claim includes the value of the Lifts plus the proceeds of the Lifts generated post-petition minus the necessary expenses Debtor incurred in operating its business during the pendency of the bankruptcy. The Court has previously valued the Lifts at $1,668,000.00. Also, the uncontroverted evidence demonstrates that Debtor generated $745,557.21 in proceeds, net of uncollectible accounts receivable, from the Lifts post-petition. (Kopp Affidavit ¶ 3; Kopitskie Affidavit ¶ 8).

Concerning the necessary cost of operating Debtor's business, Debtor's expert recited in his affidavit that he reviewed Debtor's financial statement and that the total cost of operating the business during the pendency of the bankruptcy was $259,454.00. (Smith Affidavit ¶¶ 5–7; Exhibit A). Also, Debtor's Vice President stated that the $259,454.00 represented the necessary expenses Debtor incurred in operating its business during the pendency of the case. (Kopp Affidavit ¶¶ 5–8).

GE Capital's expert did not controvert the statements contained in the affidavits of Smith and Kopp, but rather asserted that for purposes of § 506(c), GE Capital's secured claim should only be surcharged by the direct cost associated with generating proceeds from the Lifts, which was $58,638.00. (Kissane Affidavit ¶¶ 6–9).

As outlined above, Debtor is entitled to surcharge all of its reasonable expenses against GE Capital's secured claim as a matter of law under *Boatmen's* and *Hen House.* Thus, the Court will accept Debtor's conclusion that Debtor incurred $259,454.00 in necessary expenses during the pendency of the bankruptcy. Accordingly, subtracting the total reasonable cost Debtor incurred in operating its business from the value of the Lifts and post-petition proceeds, the total value of GE Capital's secured claim is $2,156,881.12.

For purposes of valuing GE Capital's secured claim as of the petition date under § 506(a), the Court must deduct the payments GE Capital received under the Cash Collateral Orders and the Sale Proceeds. There is no dispute that Debtor paid GE Capital $449,001.13 under the Cash Collateral Orders. (Kopp Affidavit ¶ 3; Kopitskie Affidavit ¶ 8).

■ The parties, however, have submitted contradictory figures as to the Sale Proceeds Debtor remitted to GE Capital. Debtor's evidence indicates that it remitted $151,560.95 in Sale Proceeds to GE Capital. (Kopp Affidavit ¶ 3). GE Capital's evidence suggests that Debtor remitted $85,274.00 in Sale Proceeds to it. (Kopitskie Affidavit ¶ 8). The parties have agreed that the Court may resolve any factual issues based on the affidavits. (Runck Affidavit ¶ 2). The affidavits, however, do not provide the Court with any facts that would provide a basis to resolve the dispute. Accordingly, there is a material issue of fact as to the amount of Sale Proceeds that Debtor remitted to GE Capital. Therefore, neither party is entitled to summary judgment as to the value of GE Capital's secured claim as of the date of confirmation.

## C. Value of GE Capital's Total Claim

The parties agree that the value of GE Capital's total claim against Debtor's estate as of the confirmation date equals the Debtor's total claim minus any the payments it received during the pendency of the bankruptcy. There is no dispute that GE Capital's total claim was $2,948,160.77 as of the petition date. However, as indicated above, there is a genuine dispute of material fact as to the amount of Sales Proceeds Debtor remitted to GE Capital during the pendency of the case. Accordingly, as with the value of GE Capital's secured claim on the confirmation date, neither party is entitled to summary judgment on the issue of GE Capital's total claim against the estate.

### CONCLUSION

GE Capital's secured claim includes the entire amount of proceeds generated post-petition as a matter of law. Accordingly, GE Capital is entitled to partial summary judgment under Fed.R.Civ.P. 56(d) to the extent that the value of its secured claim includes the $745,575.31 in proceeds generated post-petition. Also, Debtor is entitled as a matter of law under § 506(c) to surcharge GE Capital's secured claim by the reasonable expenditures it incurred while operating its business during the pendency of the case. Therefore, Debtor is entitled to partial summary judgment under Rule 56(d) to the extent that it is allowed to surcharge GE Capital's secured claim in the amount of $259,454.00.

There is, however, a genuine issue of material fact in dispute as to the amount of Sales Proceeds that Debtor remitted to GE Capital. Accordingly, neither party is entitled to summary judgment as to the value of either GE Capital's secured claim or total claim against the estate as of the date of confirmation. Therefore, the Court will set the issue of the amount of Sales Proceeds that Debtor remitted to GE Capital for an evidentiary hearing.

An Order consistent with this Memorandum Opinion will be entered this date.

### ORDER

For the reasons set forth in the Memorandum Opinion filed this date,

**IT IS HEREBY ORDERED that** GE Capital's Motion for Summary Judgment is **GRANTED** to the extent that its allowed secured claim under 11 U.S.C. § 506(a) includes the proceeds generated post-petition in the amount of $745,575.31 and is **DENIED** in all other respects.

**IT IS FURTHER ORDER that** Debtor's Cross Motion for Summary Judgment is **GRANTED** to the extent that it may surcharge GE Capital's secured claim by the reasonable expenses it incurred in operating its business during the pendency of the bankruptcy case in the amount of $259,454.00 and is **DENIED** in all other respects.

**IT IS FURTHER ORDER that** the Court will conduct an evidentiary hearing on January 28, 2003, at 10:00 a.m. in Bankruptcy Courtroom Five South, Thomas F. Eagleton United States Courthouse, 111 South Tenth Street, 7th Floor, St. Louis, Missouri, to determine the amount of proceeds that Debtor remitted to GE Capital concerning the sale of certain pieces of inventory in which GE Capital had a security interest.

**IT IS FURTHER ORDERED that** pursuant to Fed.R.Civ.P. 56(d) the following facts shall be deemed established:

(1) GE Capital's allowed secured claim under § 506(a) with respect to the lifts is $1,668,000.00;

(2) GE Capital's allowed secured claim under § 506(a) includes $745,575.31 in post-petition proceeds;

(3) Debtor may surcharge GE Capital's allowed secured claim in the amount of $259,454.00 under § 506(c);

(4) Debtor surrendered $449,001.12 in cash collateral to GE Capital during the pendency of the of the bankruptcy case; and

(5) GE Capital's total claim against the estate as of the petition date was $2,948,160.77.