

**ORDERED PUBLISHED**

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP No. EC-18-1266-TaBS |
| COLUSA REGIONAL MEDICAL CENTER, | Bk. No.   2:16-bk-23655 |
| Debtor. | |
| UNITED STATES DEPARTMENT OF AGRICULTURE, | |
| Appellant, | |
| v. | **OPINION** |
| J. MICHAEL HOPPER, Chapter 7 Trustee, | |
| Appellee. | |

Argued and Submitted on June 20, 2019
at Sacramento, California

Filed – September 10, 2019

Appeal from the United States Bankruptcy Court
for the Eastern District of California

Honorable Christopher D. Jaime, Bankruptcy Judge, Presiding

Appearances:      Jeffrey James Lodge, Assistant United States Attorney,
                  argued for appellant; Kristen Renfro of Desmond, Nolan,
                  Livaich & Cunningham argued for appellee.

Before: TAYLOR, BRAND, and SPRAKER, Bankruptcy Judges.

TAYLOR, Bankruptcy Judge:


**INTRODUCTION**

The Colusa Regional Medical Center provides the only hospital and
emergency medical services to thinly-populated Colusa County, California.
Facing financial problems, it ceased operations in 2016 and initiated a
chapter 7 case.[1] The majority of its assets were over encumbered by liens,
including those held by the United States Department of Agriculture (the
"USDA").

J. Michael Hopper was appointed trustee. He successfully
orchestrated a sale of a substantial portion of Debtor's assets, and the
record supports that the hospital thereafter reopened and hospital medical

---

[1] Unless specified otherwise, all chapter and section references are to the
Bankruptcy Code, 11 U.S.C. §§ 101–1532, all "Rule" references are to the Federal Rules
of Bankruptcy Procedure, and all "Civil Rule" references are to the Federal Rules of
Civil Procedure.

2

services resumed. The Trustee achieved excellent results in the case that benefitted both creditors and the citizens of Colusa County.

The present appeal concerns the question of who should pay a substantial portion of the Trustee's attorney's fees and his entire interim statutory commission. By way of a surcharge motion, the Trustee argued that many of his fees and costs were devoted to preserving and protecting the USDA's collateral, that the USDA saw considerable benefit (including achievement of its expressed desire that Colusa County not be without hospital services), and, thus, that the USDA should shoulder these significant expenses. The USDA disagrees; it suggests that the estate (and, derivatively, other creditors) should cover these administrative costs. The bankruptcy court agreed with the Trustee.

We determine that the bankruptcy court clearly erred in finding surcharge objectively appropriate; it did not employ the test required by Ninth Circuit precedent and, thus, it failed to make factual findings that support surcharge. It also erred when it considered evidence introduced only on reply and found that the USDA impliedly consented to surcharge or caused the administrative expenses that form the basis for the Trustee's surcharge request.

Accordingly, we VACATE and REMAND for further proceedings.

# FACTS[2]

Debtor was a nonprofit public benefit corporation that opened in 2001. It was the principal health care facility in Colusa County, California, and consisted of its only hospital, three family medical clinics, and a women's health center. Facing a financial crisis, it halted operations in April 2016 and filed a chapter 7 petition two months later.

No one disputes that Colusa County had a critical need for reopening of the hospital. The County argued that as of the petition date Colusa County residents faced a 30 to 45 minute ambulance ride to reach an emergency room, sometimes in situations where time was a factor in survival. Thus, the public interest overwhelmingly favored a chapter 7 liquidation that allowed the hospital to resume operations.

Fortunately for all concerned, the Trustee received an offer to purchase the assets necessary to reopen the hospital almost immediately. The billing statements in the case evidence that the Trustee and his attorney met with the eventual purchaser approximately three weeks after the Trustee's appointment and filed an initial motion to approve a sale to American Specialty Healthcare, Inc. ("American Specialty") a little more

---

[2] We exercise our discretion to take judicial notice of documents electronically filed in the underlying bankruptcy case. *See Atwood v. Chase Manhattan Mortg. Co. (In re Atwood)*, 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003).

than a week later.[3] There were hurdles, but the American Specialty sale closed, and the hospital reopened to the benefit of many.

**Debtor's assets and liabilities.** Debtor's assets included real and personal property leases and commercial real property. The estate also held other personal property, including licenses relating to its operations; various non-leasehold furniture, fixtures, and equipment; $565,000 in cash or cash equivalents; approximately $11,000,000 in accounts receivable[4]; and a claim for recovery of a preference in the approximate amount of $160,000.

The USDA's lien encumbered many of these assets and secured an approximately $3,000,000 debt. In particular, the USDA held a first priority lien on accounts receivable and their proceeds, the real property lease between Colusa County and the Debtor,[5] as well as the equipment and other tangible and intangible personal property related to operation of the hospital.

The USDA, however, did not hold a lien against Debtor's fee simple interest in the "Williams Family Health Center", a real property asset

---

[3] The petition date was June 3, 2016. The Trustee's time records record a one hour entry for: "Meeting . . . with [American Specialty] re: sale of CRMC campus and leases" on June 27, 2016. His lawyers, similarly, recorded an entry for "prepare for and meet with buyers" on that same date. On July 6, 2016, the Trustee filed a motion to sell assets to American Specialty.

[4] The schedules estimate that only approximately $1.5 million of this amount was collectible.

[5] The hospital is located on this leasehold.

valued in Debtor's schedules at $861,164 (the "Williams Property").
Another creditor held a lien on this asset that secured a debt in the
approximate amount of $320,000.[6]

The schedules, thus, evidence that in any reasonable scenario there
would be funds in the estate to pay administrative expenses. But the
apparent availability of funds to pay administrative expenses meant that
the Trustee was unable to avoid the estate's patient records obligations
under applicable law. *See* 11 U.S.C. § 351. These responsibilities increased
the costs of administration; for example, early in the case, the Trustee had
to seek bankruptcy court permission to destroy stale patient records.

And not surprisingly, there were numerous junior secured creditors,
unsecured creditors, and priority creditors.

**Cash collateral.** While the hospital was not operational and the
Trustee never filed a § 721 motion authorizing him to operate a business,
the Trustee had a critical need for cash collateral in the early stages of the
case. First, he needed security guards to protect the hospital physical plant.

---

[6] There is also no evidence in the record or available on the case or claims docket evidencing that the USDA held a lien on the 2016 leases and subleases between Debtor and Adventist Health in relation to the Williams Property and a clinic location in Arbuckle, California. Prepetition the Debtor leased or sub-leased its Arbuckle, Williams Property, and hospital site clinic locations to Adventist Health. Adventist Health describes itself in documents filed on the case docket as a nonprofit organization which provides health services to rural communities. It also stated that it operated the clinics under its own license and without operational or other support from the Trustee or Debtor's estate.

Second, absent immediate turnover of assets to the USDA, he needed personnel knowledgeable in the collection of medical receivables and accounting records software. Third, he needed software to manage electronic patient records. Fourth, he needed to pay for insurance, including a tail policy that would provide the estate with a defense to malpractice claims filed postpetition. Fifth, he needed to pay utilities. And finally, he needed limited office space.

The USDA was the focus of cash collateral negotiation, although the Trustee acknowledged that Debtor's cash and accounts receivable assets were subject to other junior competing lien interests held by Amerisource-Bergen Drug Corporation, River Valley Community Bank, Cardinal Health, and FlexCare LLC.

In the initial cash collateral motion, the Trustee acknowledged partial USDA consent and noted that the Debtor had about $565,000 in cash on the petition date, that he anticipated that this amount would soon exceed $1,000,000, and that he could increase collection recoveries by using USDA cash collateral to finance collection efforts. And before the cash collateral hearing, he advised that the USDA now supported all proposed cash collateral uses except for the payment for malpractice tail insurance. The bankruptcy court later overruled the USDA's objection and allowed all cash collateral use as proposed by the Trustee.

To adequately protect the USDA, the cash collateral order provided it

with replacement liens on all postpetition causes of action, including avoidance actions, but the order clarified that the replacement liens would not encumber the Williams Property or its income and proceeds. The order also allowed the USDA to receive payments from its cash collateral of $20,000 a month.

The USDA directly benefitted from some of the requested cash collateral use. The security guards protected its tangible collateral. The personnel collecting receivables did so for its benefit. And the accounting software, as well as the patient records software, assisted in these collections.

But the USDA was not the only party who benefitted. The patient records software, paid for with USDA cash collateral, preserved patient records, even if not necessary for collection, and, thus, eliminated or limited the use of unencumbered estate assets to maintain patient records. Also, USDA cash collateral use was requested in relation to utility payments for the Williams Property and Arbuckle clinic locations to the extent the rental income was insufficient to pay debt service on the Williams Property and all building operational costs as to all three clinic locations. And the requested use for insurance directly protected others as well. In particular, tail insurance provided no obvious benefit to the USDA; to the extent late-filed malpractice claims could not be defended, this would increase unsecured claims, but it would not result in senior claims

against the USDA's collateral.

The Trustee later obtained two additional cash collateral orders. The second order largely duplicated the first except that the Trustee did not request use for office rent and insurance premiums. The third motion largely duplicated the second but also requested use to pay renewal fees for licenses critical to both hospital operations and completion of the American Specialty sale. In this motion, the Trustee noted: "The services of the Debtor's former employees have provided substantial assistance to the Trustee in navigating the complexities involved with the Debtor's billing and collection operations and the management of the Debtor's records, and maintaining access to and security for the records is necessary to facilitate further collections and satisfy requests for records."

The USDA objected to use of cash collateral after September 27, 2016. In short, it asserted that the estate should cover expenses from other sources if the American Specialty sale had not then closed by that date. The bankruptcy court overruled its objections and allowed use as requested by the Trustee. The USDA also sought stay relief as to the accounts receivable collateral. The bankruptcy court granted its motion.

**Sale of assets.** As noted, the Trustee very rapidly identified a buyer for the hospital and clinic operations, including the Williams Property, for $1,000,000. The proposed sale to American Specialty would be free and clear of liens except as to the Williams Property, which was sold subject to

the existing lien.

In support of his sale motion, the Trustee argued, in part, that creditors would benefit from both the sale proceeds and a reduction of administrative expenses as a result of the buyer's assumption of responsibility for medical records. In other words, the Williams Property's proceeds—available for payment of administrative expenses and unsecured claims—would not be diminished by any ongoing patient-record obligations. Thus, the allocation of sale proceeds to the Williams Property provided a benefit to the estate even beyond the allocated proceeds of sale. In sum, the Trustee contended: "the proposed sale to the Buyer is a good faith effort by the Trustee to maximize the net return to the estate on account of the Sale Assets."

Thereafter, there were several objections from secured lenders and parties with executory contracts. And a supplemental motion to approve a sale agreement followed. The revised sale included additional assets (the non-leasehold furniture, fixtures, and equipment) and an increased purchase price of $1,100,000. In describing how lienholders would be treated, the Trustee represented that the USDA consented to the sale on the condition that it receive $550,000 from the sale proceeds. The Trustee, thus, allocated the remainder of the sale proceeds ($550,000) to the Williams

Property.[7] This amount was available to pay administrative creditors and to make payment to priority creditors and possibly unsecured creditors. The Trustee also allocated $31,000 of this amount to pay three lienholders other than the USDA to obtain their consent.

In November 2016, the bankruptcy court entered its order granting the supplemental sale motion (the "Sale Order").

**Subsequent Administration and the Trustee's surcharge request.** The Trustee thereafter sought interim approval of $154,878.58 in attorney's fees and expenses. In the motion, the Trustee noted that he might file a § 506(c) surcharge motion.

Over a year later, the USDA filed a motion to compel the Trustee to abandon its remaining $300,000 in cash collateral. The Trustee then filed a first interim application to approve $66,092.18 in Trustee's compensation based on $1,428,072.80 in disbursements. He concurrently filed a motion seeking to recover an amount equal to his commission and $133,167.50 of his counsel's fees from USDA collateral. He explained: "Working in

---

[7] We acknowledge that the schedules evidence that the equity available to the estate from the Williams Property (before reduction for costs of sale), was slightly less than this amount and that the Debtor had admittedly limited additional assets such as the Arbuckle lease and Adventist Health subleases. But the bankruptcy court and the Trustee clearly viewed this case through a lens that broadly assumed that the Trustee's obvious options were the sale he chose or a stand alone sale of the Williams Property coupled with abandonment. In effect, the trial court discounted the availability of realizable equity from other assets. We see no error in this determination and make the same assumption.

conjunction with various interested parties trying to preserve both the economic value of the hospital and associated assets, and the public interest in preserving the hospital and health services in Colusa County, the Trustee undertook" the task of attempting a sale of the hospital and its related assets.

The Trustee initially supported the surcharge motion with his own declaration. It consisted of an outline of case progress, an overview of the asserted secured claims, and a broad overview of disbursements in the case. The Trustee also provided time records for himself and his attorneys and a schedule of the disbursements that justified his statutory commission. But the Trustee discussed the USDA's involvement in the case only in brief.[8] Nowhere in the declaration did the Trustee discuss any specific interactions with the USDA that allegedly influenced his actions in the case. He similarly failed to discuss the alleged motivations and analysis that led him to accept the offer from American Specialty as opposed to pursuing sale of the Williams Property and abandoning other assets. And

---

[8] In his declaration, he stated: the undisputed fact of the USDA's possession of liens, 2:18–19 & 3:7; the fact that he sold free and clear of these liens and paid the USDA $550,000 from sale proceeds, 4:19–22; the adequate protection payments and replacement liens received by the USDA, 5:26–28; the fact that the USDA obtained stay relief to undertake collections in November of 2016 but, to the best of his knowledge, did not engage in such collections, 6:22–25; the fact that he engaged in settlements and litigation that freed up $92,500 for the USDA, 7:21–8:11; the fact that he returned an overpayment with the remainder ($187,986) subject to the USDA's lien at 8:12–19; and the quantum of payments to the USDA from all sources at 8:20–9:2.

12

he made no effort to tie particular fees to a benefit to the USDA and its collateral.

The Trustee sought surcharge for fees broadly related to sale of the hospital and the vast majority of other case activity from the petition date through closing of the sale. The Trustee conceded that the USDA did not expressly consent to surcharge but argued that it impliedly consented.

Not surprisingly, the USDA opposed. It broadly disputed the appropriateness of surcharge and specifically disputed that the Trustee adequately established a benefit to the USDA or consent by the USDA for the purposes of surcharge.

In connection with his reply, the Trustee submitted his own brief supplemental declaration. In it, he recounted two conversations for the first time:

- "On June 10, 2016, I spoke with Jeffrey A Streiffer, counsel for the [USDA], about the USDA's claim and the USDA's desire for me to preserve its collateral. Mr. Streiffer told me that the USDA was open to reducing its loans to secure a buyer for the Debtor's hospital and related assets and that the USDA did not want to leave the Colusa community without the health services provided by the hospital."

- "I also spoke numerous times with Anita Lopez, the community facilities director with the USDA that was handling this case, who told me at the outset of this case that the USDA wanted to preserve

13

health services in Colusa and later indicated to me that it was not prepared to pursue its own collection activities."

At the hearing on the surcharge motion, the USDA argued as outlined in its opposition. It also objected to the supplemental declaration on multiple theories including that it exceeded the scope of what was appropriate for a reply and, thus, that the USDA could not provide a meaningful response.

The bankruptcy court then provided an oral ruling. It overruled the USDA's objection to the second declaration, reasoning that unspecified civil rules and local rules required pre-hearing written objections.[9] Noting that surcharge is evaluated under two tests, an objective test and a subjective test, it concluded that the Trustee satisfied both.

In its evaluation of both tests, it found that the USDA obtained a benefit and that the USDA could not have duplicated the benefit provided by the American Specialty sale and the collection of receivables by the estate. It concluded that, without the Trustee's efforts, the USDA would not have received significantly more than the $565,000 in cash available on the petition date. Indeed, it added that it was "not persuaded that USDA could

---

[9] The bankruptcy judge also noted that the USDA failed to file any written objections to the evidentiary assertions contained in the first declaration as required by the Local Bankruptcy Rules. We do not find this surprising given the content of the Trustee's initial declaration; it is an outline of the timeline of the case at a high level. Having reviewed the docket and the record, we see nothing inconsistent with a faithful overview of case history.

or would have collected any receivables." Hr'g Tr. (Sept. 11, 2018) 18:3–4. And it continued: "In fact, according to its community facilities director, USDA was not prepared to do that at the inception of the case, and it also made no effort to do that after the automatic stay was terminated in November of 2016 for the express purpose of allowing USDA to collect accounts receivable." *Id.* at 18:4–9.

It also reasoned that the USDA would have realized nothing on account of its lease, license, and intangible collateral.

Finally, it faulted the USDA for failing to submit evidence about the value of the furniture, fixtures, and equipment, and concluded that it would not have received more than the $100,000 the Trustee received through the American Specialty sale.

Having determined that the USDA would have effectively abandoned its receivable collateral (and using math that ignores even the $100,000 previously allocated to the USDA's tangible personal property collateral), the bankruptcy court found that the USDA received $2,000,000 from the estate and that "$649,000 of [USDA's] collateral was expended to produce that $2 million that USDA received. Crediting for that use of cash collateral, that is a net benefit to the USDA of $1,351,000." *Id.* at 18:21–24. This net benefit, the bankruptcy court found, "exceeds by at least $702,000 what . . . USDA would have received at the inception of this case . . . and that is the $565,000 in cashier's checks." *Id.* at 19:1–6.

In further support of its conclusion, the bankruptcy court noted: "Just so there is no doubt that USDA benefitted by the preservation and disposition of its collateral and that it understood that it benefitted by that sale, preservation and sale, again, I refer to USDA's prior counsel's statement during the hearing on September 27, 2016, where there's statement of benefit." *Id.* at 19:7–12.

The bankruptcy court also considered necessity and emphasized the statement by the USDA's counsel that it was willing to reduce its loans in order to keep medical services in Colusa County. *Id.* at 18:10–15. Thus, it noted: "in light of USDA's desire for the trustee to preserve and sell its collateral so that Colusa County would not be left without medical services and the importance of that objective to USDA given its willingness to reduce its loans to make that happen, the expenses that the trustee and his professionals incurred were necessary." *Id.* at 20:2–7.

Finally, as relevant to the objective test, the bankruptcy court concluded that the surcharge amount was reasonable. It emphasized that the sale of the hospital and the associated leases and licenses was not easy, involved numerous moving parts, aggressive and somewhat contentious hearings, and medical and patient records issues. *Id* at 20:8–15.

The bankruptcy court next found that the USDA impliedly consented to the surcharge. Although acknowledging that consent could not be inferred from limited cooperation, the bankruptcy court found that the

16

USDA "caused the expenses the trustee and his professionals incurred when its counsel told the trustee that its overriding objective was not to eliminate medical services from Colusa County." *Id.* at 21:9–15. That this goal was important to the USDA, the bankruptcy court found, was clear, because it "offered to reduce its loans to see that objective achieved." *Id.* at 21:16–19. As a result, the bankruptcy court reasoned, the "USDA's involvement was not so much mere cooperation with the trustee, but rather, and actually, was the impetus for the trustee to act and the reason the trustee acted as he did." *Id.* at 21:19–22. "In that respect," the bankruptcy court continued, the "USDA caused the expenses that the trustee and his professionals incurred and now seeks [to] surcharge." *Id.* at 21:19–24.

The bankruptcy court also noted: "The only evidence of why the trustee pursued preservation of a going concern sale of the hospital and related assets rather than a simple liquidation of the property of the estate is found in the trustee's supplemental declaration that's filed with the reply." *Id.* at 12:19–23. The bankruptcy court continued: "According to that declaration, the trustee's efforts and the direction that this Chapter 7 case took resulted from the USDA's twin desires" to sell the assets so that Colusa County would not be without medical services and to collect receivables "that USDA was not prepared to collect on its own behalf at that time." *Id.* at 12:24–13:7. Based on these requests, the bankruptcy court

17

found, the Trustee worked to sell the hospital as a going concern.

The bankruptcy court noted that other factors supported its implicit consent finding. First, it observed that the "USDA was aware early in the case that the asset liquidation without a sale as a going concern would not net sufficient funds to pay administrative expenses and its secured claim in full." *Id.* at 22:1–4. Second, it found that the USDA, to a significant extent, controlled and directed the Trustee's actions by limiting the use of its cash collateral—this had the effect of focusing the Trustee on selling the hospital as a going concern. *Id.* at 22:14–25.

The bankruptcy court entered its order granting the Trustee's motion and authorizing the Trustee to surcharge $199,259.68 from the USDA's collateral. The USDA timely appealed.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334, 157(b)(2)(B), and 157(b)(2)(M). We have jurisdiction under 28 U.S.C. § 158.

## ISSUES

Did the bankruptcy court err by overruling the USDA's evidentiary objections to the Trustee's declaration?

Did the bankruptcy court err when it surcharged the USDA's collateral?

## STANDARDS OF REVIEW

We review evidentiary rulings made in the context of a summary

18

judgment motion for an abuse of discretion. *Wong v. Regents of Univ. of Cal.*, 410 F.3d 1052, 1060 (9th Cir. 2005). We review the bankruptcy court's interpretation and application of the local rules for an abuse of discretion. *Shalaby v. Mansdorf (In re Nakhuda)*, 544 B.R. 886, 898 (9th Cir. BAP 2016), *aff'd*, 703 F. App'x 621 (9th Cir. 2017).

We review entitlement to surcharge, a question of law, de novo. *Debbie Reynolds Hotel & Casino, Inc. v. Calstar Corp., Inc. (In re Debbie Reynolds Hotel & Casino, Inc.)*, 255 F.3d 1061, 1065 (9th Cir. 2001). But "[t]he issue of whether expenses were reasonable, necessary, and benefitted the secured creditor is a question of fact which we review for clear error." *Golden v. Chicago Title Ins. Co. (In re Choo)*, 273 B.R. 608, 610-11 (9th Cir. BAP 2002).

A factual finding is clearly erroneous, if, after examining the evidence, the reviewing court "is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985). More concretely, a factual finding is clearly erroneous if it is illogical, implausible, or without support in inferences that may be drawn from the facts in the record. *See TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 832 (9th Cir. 2011).

## DISCUSSION

### A.    The Trustee's motion was timely.

The USDA initially argues that the surcharge motion was untimely,

because a surcharge must be paid from collateral proceeds and the USDA had already received the proceeds from the American Specialty sale. It also argued that laches barred the motion. We disagree.

Surcharge payments do not come from the debtor's estate; rather, they come "directly from the secured party's recovery." *In re Debbie Reynolds Hotel & Casino, Inc.*, 255 F.3d at 1067. But, where multiple items of collateral secure a single debt, a trustee in bankruptcy may recover expenditures made in connection with the preservation or disposition of one item of collateral from the other collateral. *Lines v. N. Coast Prod. Credit Ass'n, (In re James E. O'Connell Co., Inc.)*, 893 F.2d 1072, 1074 (9th Cir. 1990).

Here, the USDA filed a single proof of claim secured by multiple items of collateral; so the Trustee could surcharge costs related to one item of collateral from other collateral. *Id.* The bankruptcy court thus correctly concluded that the motion was neither untimely nor barred by laches.

**B.** **The bankruptcy court abused its discretion when it overruled the USDA's objection to consideration of the declaratory evidence filed on reply and relied on it as substantial support for its decision.**

The bankruptcy court disregarded the USDA's oral evidentiary objection to consideration of the Trustee's supplemental declaration on reply. We agree with the USDA that this was an abuse of discretion.

Typically, a party must have an adequate opportunity to address the evidence against it and an opposing party should have both the ability to

do so in writing and to produce counterevidence. *Provenz v. Miller,* 102 F.3d 1478, 1483 (9th Cir. 1996) ("We agree with the Seventh Circuit, which held that '[w]here new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the [non-]movant an opportunity to respond.'" (alterations in original) (citing *Black v. TIC Inv. Corp.,* 900 F.2d 112, 116 (7th Cir. 1990))).

Here, the bankruptcy court considered this evidence and heavily relied on it notwithstanding the USDA's oral objection. It did so based on the stated conclusion that civil rules and the local rules require that all evidentiary objections to testimony must be submitted in writing before the hearing. The bankruptcy court, however, did not cite to any specific rule that so states; we cannot identify one that supports this conclusion.

Neither the Federal Rules of Bankruptcy Procedure nor the Federal Rules of Civil Procedure contain such a rule. Nor do the Local Rules for the United States Bankruptcy Court for the Eastern District of California ("Local Rules" or "LBR"). They expressly state that supportive evidence should be filed with a motion and opposition. LBR 9014-1(d)(3)(D) & (f)(1)(B). But, while they allow for a reply, they make no mention of submission of evidence on reply. LBR 9014-1(f)(1)(C). And, while they allow parties to file a document giving citation to newly issued authority at any time before the hearing, they expressly bar the filing of any other memorandum, declaration, or document, other than those otherwise

21

specified, without court approval. LBR 9014-1(f)(1)(D).[10] If there is a violation of a rule here, it appears to be a violation of Local Rule 9014-(f)(1)(D) at the hands of the Trustee. The Local Rules barred the USDA from filing a written evidentiary objection.[11]

Thus, the bankruptcy court abused its discretion in considering the late-filed evidence without providing the USDA with an opportunity to provide written response and counterevidence. And this was not harmless error because the bankruptcy judge relied heavily on this evidence; indeed he described it as the only evidence of the Trustee's reasons for pursuing the American Specialty sale.

But, even if the declaration is considered, we conclude that we must vacate and remand for further proceedings. Thus, we provide more analysis.

---

[10] The bankruptcy court may have been thinking of Local Rule 7056-1(f), which governs evidentiary objections in connection with motions for summary judgment. The non-movant (here, the USDA) is required to "file and serve written objections to movant's evidence not later than the date specified in subdivision (b) of this rule." LBR 7056-1(f). Subdivision (b), however, concerns the initial opposition to the motion for summary judgment. As a result, this local rule does not contemplate objecting to declaratory evidence submitted in a reply. It, thus, is inapposite and did not require the USDA to file a written evidentiary objection.

[11] The Local Rules incorporate only limited and specific rules of the United States District Court for the Eastern District of California ("District Court Rules"). *See* LBR 1001-1(c). None of the incorporated District Court Rules are relevant to this issue, and nowhere else in the District Court Rules is there a requirement of pre-hearing written opposition to evidence introduced on reply.

**C.     The Trustee failed to show he was entitled to surcharge under the objective test.**

"Generally, bankruptcy administrative expenses may not be charged to or against secured collateral." *In re Choo*, 273 B.R. at 611. But § 506(c) codifies a common law exception to this rule. *Id.* It provides:

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property.

11 U.S.C. § 506(c). The party seeking surcharge under § 506(c) bears the burden of proof. *Fed. Deposit Ins. Corp. v. Jenson (In re Jenson)*, 980 F.2d 1254, 1260 (9th Cir. 1992).

Section 506 continued a practice that existed under the Bankruptcy Act of 1898. *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 9 (2000). That practice "was not to be found in the text of the Act, but traced its origin to early cases establishing an equitable principle that where a court has custody of property, costs of administering and preserving the property are a dominant charge." *Id.*

But striking the right balance when evaluating surcharge is important. In explaining why mere cooperation with the debtor does not make the secured creditor liable for all expenses of administration, the Ninth Circuit cautioned that shifting liability to the secured creditor would make it difficult, if not impossible, to induce new lenders to finance a

23

chapter 11 operation. *Cent. Bank of Montana v. Cascade Hydraulics & Util. Serv., Inc. (In re Cascade Hydraulics & Util. Serv., Inc.)*, 815 F.2d 546, 548-49 (9th Cir. 1987). And, as it further acknowledged, "[i]t would discourage the trustee or debtor in possession from taking reasonable steps to expedite the reorganization and encourage negligence." *Id. Cf. Hartford Underwriters Ins. Co.*, 530 U.S. at 13 ("The possibility of being targeted for such claims by various administrative claimants could make secured creditors less willing to provide postpetition financing.").

And consistent with the importance of encouraging reasonable secured creditor cooperation as a general matter, this case has an additional public policy overlay: the provision of critical medical services to Colusa County. In evaluating surcharge, we conclude that a creditor's altruism, here a willingness to consider reduction of a secured claim to assist in retention of medical services to a rural area, is not, in insolation, a sufficient basis for surcharge. Deterrence of creditor cooperation through fear of surcharge is particularly to be avoided where critical public benefits are at issue.

Thus, to surcharge expenses under § 506(c), the Trustee "must prove that its expenses were reasonable, necessary[,] and provided a quantifiable benefit to" the USDA. *In re Debbie Reynolds Hotel & Casino, Inc.*, 255 F.3d at 1068. And this benefit must be more than incidental or arising in the context of generalized benefit to the estate. *In re Cascade Hydraulics & Util.*

24

*Serv., Inc.*, 815 F.2d at 548. The objective test is "not an easy standard to meet." *In re Debbie Reynolds Hotel & Casino, Inc.*, 255 F.3d at 1068. The burden is onerous. *Id.* At a simplistic level, the Trustee must show that the specific administrative expenses at issue were reasonable in amount and necessary to a result beneficial to a secured creditor. *In re Cascade Hydraulics & Util. Serv., Inc.*, 815 F.2d at 548. So, the benefit cannot be hypothetical. *Compton Impressions, Ltd. v. Queen City Bank, N.A. (In re Compton Impressions, Ltd.)*, 217 F.3d 1256, 1261 (9th Cir. 2000). And the administrative expenses must be incurred primarily for the secured creditor's benefit. *In re Cascade Hydraulics & Util. Serv., Inc.*, 815 F.2d at 548.

When considering the threshold inquiry of necessity to the secured creditor, a court should consider whether the secured creditor "could have internalized many of the post-petition costs incurred by the Debtor and its professionals simply by using in-house resources." *In re Compton Impressions, Ltd.*, 217 F.3d at 1261. Thus, the necessity and reasonableness of the Trustee's incurred expenses must be balanced against the benefits obtained for the secured creditor and the amount that the secured creditor would have necessarily incurred through foreclosure and disposal of the property. *Id.* at 1260.

1. **The bankruptcy court applied the wrong legal standard when it analyzed benefit at a global level for purposes of the objective test for § 506(c) surcharge.**

Section 506(c) and caselaw make clear that surcharge is permissible

25

when the *requested expenses* were necessary, reasonable, and of specifically identifiable and tangible benefit to the secured creditor. The expenses need to be tied to a corresponding, quantifiable benefit—which, itself, needs to be more than just incidental from the perspective of collateral preservation.

The bankruptcy court did not undertake this analysis (nor did the Trustee). Instead, the bankruptcy court found that the USDA's benefit was $786,000, calculated by taking the USDA's receipt of $2,000,000, deducting the use of $649,000 in cash collateral, and comparing it to the $565,000 in cash in Debtor's accounts on the petition. The bankruptcy court's approach, thus, involves looking at the USDA's payout in *the entire case* and finding a benefit justifying surcharge because the payout to the USDA, net of cash collateral use, was greater than the cash on hand when the case was filed and greater than an assumed recovery if the USDA did not get the benefits of the American Specialty sale.

This global analysis is inconsistent with the test mandated by the Ninth Circuit. And its faults become clear when one focuses on the components of the USDA's alleged benefit.

**Turnover of accounts receivable collections obtained through fortuity or use of USDA cash collateral did not create a benefit for surcharge purposes.** The bankruptcy court found a benefit justifying surcharge based in part on the estate collecting receivables and turning them over to the USDA. It mathematically acknowledged that the USDA

financed these efforts by deducting from its calculation of benefit an amount equal to USDA cash collateral expended by the Trustee. But this calculation is legally flawed because neither the Trustee nor the bankruptcy court identified any associated administrative expense paid from non-USDA collateral to produce this benefit.

At oral argument, the Trustee's counsel conceded that neither the Trustee nor his counsel was involved in the highly specialized effort to collect hospital receivables. Instead, the Trustee used USDA cash collateral to pay former hospital employees to do so. Thus, the surcharge request relating to collection of receivables amounts to the Trustee double dipping: he first used the USDA's cash collateral to pay Debtor's former employees to collect receivables and to maintain the records required for collections; having done that, the Trustee then claims this "benefitted" the USDA in paying out the resulting proceeds and asks for surcharge. Where the USDA already paid the specific administrative expenses related to receivable collections from its cash collateral, requiring it to pay these expenses again through surcharge is error. And that is exactly what the bankruptcy court's high level analysis requires in material part.

The bankruptcy court attempted to bolster its reliance on accounts receivable collections and turnover by finding that the USDA would have done nothing except gather the cashier's checks already in Debtor's accounts; it based this finding on the Trustee's recollection, in the

declaration on reply, that the USDA's community facilities director handling the case said that the USDA was not prepared to pursue its own collection activities. Thus, the bankruptcy court concluded, the Trustee's paying accounts receivable proceeds over to the USDA produced a quantifiable benefit to the USDA. This finding is directly contradicted by the record and documents on the bankruptcy court's docket.

In the Trustee's supplemental declaration related to his initial cash collateral motion, the Trustee explained that the estate had $565,000 in cash on the petition date and, ten days later, the estate had received $260,000 by direct deposit and $58,000 by mailed checks. The Trustee stated that he understood that about $1,400,000 of the $11,000,000 accounts receivable were collectible but noted that maximizing the collections would require monetary expenditures. The USDA consented to use of its cash collateral to allow this maximization, and the Trustee so used this money.[12] Indeed, even in the Trustee's surcharge motion, the Trustee represented that he maintained a deposit account in Debtor's name that continued to receive periodic direct deposits on account of receivables.[13] The record makes clear

---

[12] This included cash collateral use to maintain the records necessary for such collections and fulfillment of the Trustee's record-keeping obligations.

[13] This is related to the USDA's broader "necessity" argument that, although highly persuasive, we need not rely on for our decision: the USDA argues that it would not have incurred any legal fees to dispose of its collateral because it administers its own loans, agency attorneys provide legal services, and the United States Attorney's

(continued...)

that the USDA would have received more than cash on hand on the petition date if the Trustee did nothing but open the mail and transfer collections after direct deposit.

We, thus, conclude that broadly including the proceeds from accounts receivable collections in the calculation of monetary benefit was erroneous. The Trustee identifies no administrative expense related to these collections that was not paid for using USDA cash collateral.

**The American Specialty sale provided only incidental benefit to the USDA as it otherwise benefitted the estate generally; it was not appropriate to surcharge USDA collateral for all related administrative expenses.** The Trustee also seeks to surcharge USDA collateral for all costs of the American Specialty sale. But because the USDA was not the only or even primary recipient of sale proceeds, the conclusion that its receipt of half the monetary proceeds equated to a benefit for § 506(c) purposes

---

(...continued)
Office provides litigation services. The USDA also argues that it, too, could have used its cash collateral to pay Debtor's former employees to collect the USDA's receivables.

This is not inconsistent with the statement by the USDA's community facilities director that the USDA was not prepared to pursue its own collection efforts. Setting aside the obvious questions of how the director could know this and whether the Trustee's supposed reliance on the director's statement was reasonable, the director simply said the USDA could not pursue "*its own*" collection efforts; it does not state that the USDA was unable to hire Debtor's former employees or request the United States Attorney's Office for assistance in collection activities. As such, we are not persuaded on the present record that the USDA (i.e., the federal government) was incapable of collecting its collateral receivables.

sufficient to surcharge 100% of the costs related to the sale was erroneous.

As a preliminary matter, the USDA argues that the sale of the hospital did not produce a quantifiable benefit but rather a net loss of $483,211.12. We need not, however, unwind the parties' accounting to determine who is correct as a factual matter because, as a broader legal matter, the sale benefitted multiple parties and, as a result, the expenses of the sale cannot be surcharged globally and entirely from the USDA's collateral. To the extent the USDA benefitted monetarily (which the USDA disputes) and keeps this benefit, this falls in the category of benefits that are permissible as incidental benefits. *Cf. In re Choo*, 273 B.R. at 613.

This is not a new proposition of law. *In re Cascade Hydraulics & Util. Serv., Inc.*, 815 F.2d at 548 ("To satisfy the benefit test of section 506(c), Cascade must establish in quantifiable terms that it expended funds *directly* to protect and preserve the collateral." (emphasis added) (citing *Brookfield Prod. Credit Assoc. v. Borron*, 738 F.2d 951, 952 (8th Cir. 1984) and *Sells v. Sonoma V (In re Sonoma V)*, 24 B.R. 600, 603 (9th Cir. BAP 1982))). *See also In re Proto-Specialties, Inc.*, 43 B.R. 81, 84 (Bankr. D. Ariz. 1984) ("Action by the Trustee to benefit the estate, although also of benefit to secured creditors, is insufficient to justify a § 506(c) award. The effort and funds must be expended primarily and directly for the lienholders." (citation omitted)). As we have said, when analyzing benefit "the focus is on whether the expenditure in question was directed specifically toward the collateral, as

opposed to property of the estate generally." *In re Choo*, 273 B.R. at 611. In the latter case any benefit to the secured creditor would be incidental and surcharge would be inappropriate. *Id.* at 611–12.

Here, the asset sale included assets not subject to the USDA's lien including primarily the Williams Property. Based on the sale of non-USDA collateral, the Trustee and the estate received $550,000 (half) of the proceeds. As a result of the sale, the Trustee also reduced ongoing administrative expenses by transferring ongoing responsibility for medical records. And the sale was particularly beneficial in relation to the Williams Property because proceeds were not reduced by the costs of sale universally seen where real property is sold in isolation.[14]

So the Trustee correctly argued in his sale motion that he had a valid business justification for the sale and that the sale was in the best interests of the estate *generally*. As a result, the Trustee's and his counsel's efforts were not directed specifically and exclusively toward the USDA's

[14] The Trustee argued that the USDA benefitted because it avoided all costs of sale related to the American Specialty sale; it calculated this amount at $66,000 utilizing 6% as the estimated cost of sale. Putting aside the question of why the USDA should be held responsible for 100% of costs of sale where it received only 50% of the proceeds, we note that the real beneficiary under the bankruptcy court and Trustee's view of the case was the estate. Using 6% as the appropriate estimate of sale costs, in a standalone sale of the Williams Property at full value, sale proceeds would be reduced by $32,460 if the lienholder allowed sale subject to its lien and costs of sale were calculated only on the equity. In the more likely scenario where the Williams Property lienholder required payment from sale proceeds, the proceeds of a full value sale would be reduced by $51,669, assuming 6% costs of sale.

collateral. Other creditors were paid. The Colusa County community also reaped the societal benefit of the resumption of emergency medical services. Thus, many parties benefitted from the sale and it was erroneous to surcharge all related expenses against the USDA's collateral.

**The USDA did not receive a benefit that justifies a surcharge equal to 100% of the Trustee's statutory commission.** When one reviews the request for 100% surcharge of the trustee's statutory commission, the lack of a benefit is also obvious.

Section 326(a) limits the trustee's compensation to a specific percentage of amounts disbursed or turned over to parties in interest. So the relevant document for review is the Form 2 attached to the Trustee's First Interim Application to Approve Trustee's Compensation. We cannot do the fact-finding necessary to compare cash collateral use to exact Form 2 disbursements. But we know that it was significant because the cash collateral motion detailed types of expenses reflected in Form 2, the cash collateral motions identify payees listed in Form 2, and the bankruptcy court found that cash collateral use equaled $649,000. There was no benefit to the USDA within the meaning of § 506(c) justifying the Trustee in surcharging USDA collateral on account of a statutory commission based on payments made from other USDA collateral. Such a surcharge amounts to double payment from USDA collateral.

Similarly, we question the surcharge based on adequate protection

payments. First, they come from USDA collateral or replacement collateral. Mere turnover of a secured creditor's collateral does not create a benefit within the meaning of § 506(c).

Also, the Trustee requested surcharge of USDA collateral even in relation to payments to other creditors or in relation to distributions not obviously or even arguably related to USDA collateral. There is no benefit that supports a § 506(c) surcharge in this regard.

And finally, why should the USDA be surcharged for attorneys' fees twice? The Trustee directly requests surcharge for specific fees and then also requests surcharge on account of his commission and the disbursement on account of the same fees among others. Why is that appropriate? And while we do not understand the reasoning that brings his time sheets into the debate—the commission is not based on them in any respect—to the extent they have any relevance they underscore the logical flaw here: why is the USDA unilaterally benefitted by things such as the Trustee's initial site visit and case analysis or tasks with no logical relationship to preservation of USDA collateral? The Trustee's time records, to the extent relevant, do not support the bankruptcy court's theory of surcharge.

### 2. The USDA did not concede that it received a benefit for § 506(c) surcharge purposes.

This brings us to the bankruptcy court's conclusion that the USDA's counsel admitted to receiving a benefit for purposes of surcharge. To start,

33

because Ninth Circuit caselaw requires that the relevant benefit be concrete and quantifiable, we agree with the USDA that it was improper to consider this statement an admission of a benefit for § 506(c) purposes.

Further, the specific quote in context and in full does not support the bankruptcy court's characterization. The USDA's attorney noted that the USDA had cooperated with the Trustee because it wanted the American Specialty sale to occur but stated a concern about the length of the sale process. He then objected to the continued magnitude of cash collateral use and asked that it be scaled back to the bare minimum. The request to limit use of USDA cash collateral was based on the assertion that other parties also stood to benefit from the sale, and, thus, the USDA also requested sharing of operational costs by those other parties pending completion of the sale.

So the USDA's counsel's statement does not amount to an admission that the USDA was benefitting in isolation and thus welcomed the continued use of its cash collateral. Far from it. The USDA objected to the continued use of its cash collateral and—even as its counsel recognized the pragmatic reality that the bankruptcy court clearly indicated that it would approve the Trustee's continued use of cash collateral—suggested that other benefitting parties should share the cost. This is not an admission that a benefit for purposes of § 506(c) exists or that surcharge is appropriate.

**3. On remand, the Trustee may attempt to show some benefit sufficient for surcharge under the objective test, but he must identify specific expenses, tie them to specific collateral, and provide evidence of a benefit that takes into account his use of USDA cash collateral and situations where the benefit is merely incidental.**

While we conclude that the USDA saw some benefit from the American Specialty sale and collection of receivable collateral by the estate, any benefit was financed through cash collateral use or arising in the context of generalized benefit to the estate and does not support surcharge. But we acknowledge that, although we cannot discern it on this record, there may be a specific sale related expense justifying surcharge.

We also acknowledge that the Trustee also sought to recover fees for other activities; all of them, he argued, benefitted the USDA because at a global level the USDA saw a benefit. But, again, the bankruptcy court did not separately analyze these fees as required for § 506(c) surcharge. In a contested matter, the "bankruptcy court must render findings of fact and conclusions of law as required by Civil Rule 52(a) (incorporated by Rules 7052 and 9014(c))." *Rediger Inv. Corp. v. H Granados Commc'ns, Inc. (In re H Granados Commc'ns, Inc.)*, 503 B.R. 726, 732 (9th Cir. BAP 2013). In the absence of complete findings, "we may vacate a judgment and remand the case to the bankruptcy court to make the required findings." *First Yorkshire Holdings, Inc. v. Pacifica L 22, LLC (In re First Yorkshire Holdings, Inc.)*, 470 B.R. 864, 870 (9th Cir. BAP 2012). That said, we need not reverse, even if the

bankruptcy court rules without articulating its findings, if the record provides us "with a full, complete, and clear view of the issues on appeal." *In re H Granados Commc'ns, Inc.*, 503 B.R. at 732. Here the record does not allow us to affirm in any respect.

On remand, the Trustee must identify specific services, demonstrate that they benefitted the USDA in a quantifiable fashion, demonstrate that the benefit was predominately to the USDA and not incidental to the general benefit to creditors, and take into full consideration the extent to which the services were already paid for from USDA cash collateral.

### D. The Trustee did not show that the USDA implicitly consented to or caused the surcharged expenses.

Alternatively, the Trustee may surcharge collateral if the USDA "caused or consented to" the surcharged expenses. *In re Compton Impressions, Ltd.*, 217 F.3d at 1260. *See Weinstein, Eisen & Weiss v. Gill (In re Cooper Commons LLC)*, 512 F.3d 533, 536 (9th Cir. 2008). This is known as the subjective test. We determine that the bankruptcy court also erred in its finding that the USDA implicitly consented[15] to payment of the Trustee's

---

[15] We do not consider express consent; the Trustee conceded in his papers that the USDA did not expressly consent to surcharge, and the bankruptcy court did not rule to the contrary. As such, the parties' discussion about the United States Trustee's *Handbook for Chapter 7 Trustees* is not particularly apposite. They agree that the handbook suggests, but does not require, that trustees negotiate explicit consent for a surcharge; they disagree on what that means for this case. We are not bound by the handbook, although we note that negotiation on this point likely would have positively impacted the administrative expense bottom line as the surcharge issue would not be

(continued...)

entire commission and the vast majority of the administrative attorneys' fees in this case. Nor does the record show that the USDA caused the American Specialty sale. The bankruptcy court's analysis is legally erroneous, and its factual conclusions are not supported by the record even if the late-filed declaration is considered.

### 1. The bankruptcy court erred in finding implied consent for the purpose of § 506(c) surcharge.

Secured creditor cooperation and case participation does not inevitably lead to surcharge and liability for all administrative expenses. *In re Cascade Hydraulics & Util. Serv., Inc.*, 815 F.2d at 548 ("Mere cooperation with the [trustee] does not make the secured creditor liable for all expenses of administration."). Thus a "secured creditor's consent to the payment of designated expenses, limited in amount, is not a blanket consent to be charged with additional expenses not included in the consent agreement." *Id.* at 549. As the Ninth Circuit explained in a slightly different context:

> Here, all the Banks did by joining in the cash-collateral stipulations was authorize restricted payments for specified items in the form of carve-outs from the sales of units in the development. Neither the Banks' joinder in the cash-collateral stipulations, nor its willingness to defer foreclosure proceedings, caused the Debtor to incur the expenses sought by the surcharge motion. The Banks did nothing more than cooperate with the Debtor in its attempt to salvage some equity

---

[15](...continued)
subject to dispute. And given the trustee's heavy burden of proof, it certainly makes good sense.

from the development. The bankruptcy court did not clearly err in finding that the Banks did not cause or consent to the expenses the Debtor sought to recover by its surcharge motion.

*In re Compton Impressions, Ltd.*, 217 F.3d at 1261–62. So one question on appeal is whether the level of cooperation by the USDA rises to the level of implied consent.

Initially, we note that the Ninth Circuit has not articulated a firm test or standard for implied consent. And as it is not mentioned as a basis for surcharge in the statute, we must proceed with caution given the Supreme Court's decision in *Hartford Underwriters*, where it determined that surcharge was only available to trustees and debtors-in-possession and emphasized the plain and unambiguous language of § 506(c). 530 U.S. at 6. *See Comerica Bank-California v. GTI Capital Holdings, LLC (In re GTI Capital Holdings, LLC)*, BAP No. AZ-06-1096-PaDS, 2007 WL 7532277, at *14 (9th Cir. BAP Mar. 29, 2007). We also conclude that where the objective test is not met, implied consent will not easily fill the void. Against this background, we determine that the as-developed facts of this case cannot meet any reasonably articulated standard or test for § 506(c) surcharge.

In an unpublished decision, we noted factors that might support an implied consent finding:

> [W]hen it appears that a secured creditor in a reorganization case holding a lien on nearly all of the debtor's assets secures and promotes the services of an examiner, not only to investigate the debtor's financial affairs, but also to sell the debtor's business as a going concern and to settle outstanding

38

claims, while all the time appreciating that the debtor may be administratively insolvent, the bankruptcy court may properly conclude that the secured creditor impliedly consented that the costs of administering that bankruptcy estate be paid from its cash collateral.

*In re GTI Capital Holdings, LLC*, 2007 WL 7532277, at *15. None of these factors are present here.

First, in this case, the USDA did not hold a lien on substantially all assets. The schedules evidence that from case initiation it was clear that the estate included the Williams Property with equity available to the estate of approximately $540,000 before consideration of costs of sale. And in the first weeks of the case, the Trustee identified a substantial and easily recoverable preference of $160,000.[16] As we have already discussed, many benefitted from this bankruptcy. So this is not a case where the only beneficiary was the secured lender. It is implausible that the USDA implicitly consented to pay a statutory commission and substantial administrative attorneys' fees for distributions that it did not receive and a benefit that it did not enjoy.

Second, there is no evidence in the record or even in the docket that the USDA expressly suggested or sought the American Specialty sale. When a secured creditor expressly requests specific case activity by motion and where this activity abounds to its benefit, implied consent may be

---

[16] The Trustee's time records show that he made demand in relation to this preference two days after the petition date.

found. Implied consent should not be found where a secured creditor merely acquiesces in case activity that is of benefit to many.

And while we acknowledge that the USDA did seek cooperation in collection of its receivables, the USDA also paid the underlying estate administrative expenses from its cash collateral. Implicit consent to the payment of a broad range of administrative expenses cannot be found where the secured creditor funds requested administrative costs from its own collateral.

Finally, there is no evidence that there was ever a realistic concern that this case would be administratively insolvent. The Williams Property equity was available to pay general administrative expenses, and USDA cash collateral paid administrative expenses that directly related to its collateral and other expenses that benefitted the estate and not the USDA.

A workable implied consent test, thus, requires identification of specific expenses and evidence that would cause a reasonable person to assume that a secured creditor should be charged with that expense because it directly benefitted its collateral and because otherwise other creditors would be unjustly deprived of an opportunity for payment. Implied consent also requires either some direct creditor action to cause the expense or some inaction that suggests an understanding that it is otherwise receiving a windfall. Here, we see no such factors and nothing that would suggest as a legal and factual matter that surcharge is appropriate. The imprecise global benefit analysis that the Trustee and

bankruptcy court relied upon is not a basis for a finding of implied consent to the broad surcharge at issue here.

**2. On this record, the bankruptcy court erred in finding that the USDA caused administrative expenses such that surcharge is appropriate.**

We acknowledge that the USDA caused some administrative expenses. For example, it apparently requested cooperation in accounts receivable collection. But as to these expenses, it has already paid the related costs from cash collateral, and this causation of specific expenses is not a basis for broader surcharge. Further, the analytical flaws we noted in the bankruptcy court's application of the objective test also render its application of the cause component of the § 506(c) subjective test erroneous. The record fails to support that the USDA caused the broad range of administrative expenses that form the basis for the Trustee's surcharge request.

**There is no evidence that the USDA's desire that Colusa County maintain a hospital and its willingness to cooperate in this regard were the only reasons and, thus, the cause for the Trustee's pursuit of the American Specialty sale.** The bankruptcy court found that the USDA caused the American Specialty sale because the "only" reason the Trustee

41

pursued what it described as a going-concern sale[17] was the USDA's request that the hospital remain capable of re-opening and its agreement to cooperate in this regard; there is no support for this factual determination in the record.

First, the Trustee provided no declaration so stating. Had the Trustee provided a state of mind declaration, the USDA could have defended and requested an opportunity for cross examination. But the Trustee never provided evidence that he sold assets to American Specialty solely or even primarily because the USDA wanted Colusa County to retain access to hospital services. Nor did he provide evidence that the USDA's willingness to cooperate was the only reason he accepted the American Specialty offer.

Further, such a conclusion is illogical. The time records for the Trustee and his attorney evidence that they were speaking to American Specialty as "the purchaser" during the first month of the case. And these same time records evidence only 54 minutes of conversation with the USDA's representatives (42 minutes with Mr. Streiffer and a 12 minute conversation with Ms. Lopez) before both this meeting and the submission

---

[17] We do not understand the bankruptcy court to use this term in the usual sense of a business that remained fully operational. At the time of the sale, the Debtor had subleased its clinic locations to Adventist Health; it was not running them. And, as best we can glean from the record and the docket, other than passive collections of receivables through employees paid with USDA cash collateral and possible passive collection of rent from the clinic sites, the Debtor was not a going concern. The sale, thus, was a "going concern" sale only in that it included assets that would allow the purchaser to resume full hospital operations.

of the sale motion. The conclusion that the Trustee made the most significant business decision in the case based "only," and at most, on these two communications, especially, when he never so declares, is illogical and unsupported by the record.

The statement from Mr. Streiffer is an especially weak basis for final decision. According to the Trustee, Mr. Streiffer merely said that the USDA wanted Colusa County to have a hospital and "would consider" a claim compromise to achieve this result. It is implausible that the experienced Trustee agreed to the American Specialty sale based only on the USDA's desire that Colusa County have a hospital and the mere possibility the USDA might compromise its claim to achieve this result.

And that this conclusion is erroneous is underscored by the Trustee's statements in support of the sale motion itself, where he discusses generalized benefit to the estate from the sale, the fact that the sale included assets that were not USDA collateral, and the fact that the sale yielded significant proceeds on account of non-USDA collateral. In fact, in his sale motion, the Trustee emphasized two benefits specific to parties other than the USDA: first, he would recover proceeds from sale of the Williams Property (half the sale proceeds); and second, he would reduce administrative expenses related to medical records.

**The record does not support that the USDA controlled the case and, thus, caused the American Specialty sale.** Next, we consider the notion

43

that the USDA "controlled" the Trustee's actions, by limiting use of cash collateral or otherwise. The record does not support this either.

Again, the Trustee never said as much in either declaration. Second, to the extent it sought to control the Trustee, the USDA abjectly failed to do so. The USDA repeatedly objected to specific uses of its cash collateral; the bankruptcy court repeatedly overruled those objections. The Trustee prevailed. This does not amount to control. To the extent there was control, the bankruptcy court controlled the process, not the USDA.

In addition, the Trustee protected a significant asset unencumbered by the USDA's lien—the Williams Property. The USDA never obtained a replacement lien on this property. The Trustee then leveraged the inclusion of the Williams Property in the sale to claim half of the sale proceeds for the estate.

We acknowledge that the USDA surely benefitted from the American Specialty sale and clearly desired the sale. But the record does not support that the USDA caused or compelled the Trustee to pursue this sale. Again, the record evidences that the Trustee was motivated by other factors—to wit, the Williams Property and its scheduled equity and relief from the estate's medical record obligations. And the record is crystal clear that the other secured creditors and the estate benefitted from the sale. And we assume, as is only logical, that the Trustee was not indifferent to Colusa County's need for hospital services.

In short, the record does not support a finding that the subjective test is met in this case. The bankruptcy court clearly erred when it found otherwise. As with the objective test, however, we are not in a position, given the state of the record, to determine that there is no element of cause or implied consent that would justify some specific instance of surcharge in this case. If the Trustee attempts to justify surcharge under the subjective test on remand, he must apply an implied consent test as outlined above, and he must prove cause as to specific administrative expenses through specific evidence that takes into account the use of USDA cash collateral.

## CONCLUSION

Based on the foregoing, we VACATE and REMAND for further proceedings.